739 A.2d 41

**Paul Alva DORSEY**

v.

**STATE of Maryland.**

**Lawrence L. Craft**

v.

**STATE of Maryland.**

**Nos. 112 & 113, Sept. Term, 1997.**

Court of Appeals of Maryland.

Oct. 14, 1999.

326

328

George E. Burns, Jr., Julia Doyle Bernhardt, Asst. Public Defenders, (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner.

Cathy A. Dryden, Angela M. Eaves, Asst. Attys. Gen., (J. Joseph Curran, Atty. Gen., on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW,* RAKER, WILNER and CATHELL, JJ.

ELDRIDGE, Judge.

We granted petitions for writs of certiorari in these two cases primarily to decide whether, under Maryland law, a defendant in a circuit court constructive criminal contempt case has a right to a jury trial regardless of the sentence which is ultimately imposed by the court. Additional issues relating to the constructive criminal contempt prosecutions are also presented by the petitioners.

## I.

Since this opinion deals with two entirely separate cases, we shall set forth the relevant facts of each case in turn.

### A. *Dorsey v. State*

The Circuit Court for Cecil County in March 1994 ordered the petitioner, Paul Alva Dorsey, to pay child support in the amount of $63.00 per week. A new order was entered by the circuit court in August 1995, providing that Dorsey must pay child support of $66.00 per week beginning August 21, 1995.

In late July 1997, a petition was filed in the Circuit Court for Cecil County entitled "Petition For Civil/Criminal Contempt" and captioned "State of Maryland Or Katrina Lee Dorsey, Plaintiff vs. Paul Dorsey, Defendant." The petition had both a "civil" number and a different "criminal" number. Paragraph one of the petition stated that the "Cecil County Child Support Enforcement records indicate that Paul Dorsey has not complied with the support order and/or decree, a copy of which is annexed hereto and made a part hereof in the

---

* Chasanow, J., now retired, participated in the hearing and conference of this case while an active member of this Court but did not participate in the decisions and adoption of this opinion.

above captioned case, and is in arrears in the amount of $6,609.34 as of 7/28/97." [1]

Paragraph two of the petition consisted of two subparagraphs as follows:

"(2) [ ] (Criminal) A. It is alleged herein that the aforesaid DEFENDANT has intentionally, unlawfully, knowingly, and willfully and in bad faith, with the intent to frustrate the aforesaid Court Order and/or Decree and to defraud and to deprive the party or parties entitled to support under said order and/or decree by unlawfully failing to pay the aforesaid arrearages during the aforesaid period.

"[ ] (Civil) B. It is alleged herein that the aforesaid DEFENDANT has intentionally and unlawfully failed to pay the aforesaid arrearages during the aforesaid period."

Neither box was checked or otherwise marked. Paragraph three of the petition stated:

"(3) The maximum penalty to be imposed in this cause shall not exceed 179 days or _____."

Nothing was written into paragraph three's blank space. The petition went on, *inter alia*, to advise the defendant of the right to counsel and the right, if indigent, to be represented by the Public Defender's Office. The petition was signed by "Sharon Black, CSE Agent" and "E. D.E. Rollins, Jr., Judge." [2]

Paul Dorsey appeared before the circuit court on July 29, 1997, without an attorney. He stated that he wanted to be represented by an attorney, and the court postponed the case until August 20, 1997.

---

1. The petition, as contained in the record transmitted to this Court, has no support order annexed or attached to it. Presumably, the order referred to is the order issued in August 1995. That order is not contained in the record before this Court.

2. Hon. Edward D.E. Rollins, Jr., is an Associate Judge of the Second Judicial Circuit. He is presently the county administrative judge for Cecil County.

When the case was called for trial on August 20, 1997, the assistant public defender representing Dorsey initially asked if the action was a criminal prosecution or if it was a civil case. The following colloquy occurred:

"[DEFENSE COUNSEL]: Your Honor, before we take any testimony, are we here for criminal or civil contempt?

THE COURT: Both.

[DEFENSE COUNSEL]: We are here for both?

THE COURT: They are all charged both now.

[DEFENSE COUNSEL]: When did that start?

THE COURT: A while ago. I don't know, six months ago.

[DEFENSE COUNSEL]: Because apparently—

THE COURT: What do you have?

[DEFENSE COUNSEL]: Well, I have a form that doesn't indicate either one, first of all.

\* \* \*

[DEFENSE COUNSEL]: Today we are here for both?

THE COURT: Let me back up. We are here on civil contempt, which can be converted to criminal contempt.

[DEFENSE COUNSEL]: I understand that. My client needs to know what he is facing.

THE COURT: He is facing 179 days, and we could convert this to criminal."

The only witness for the plaintiff/prosecution was Sharon Black of the Cecil County Bureau of Child Support Enforcement. Her entire direct testimony at the "civil" phase of the trial was as follows:

"THE COURT: What's the order, Ms. Black?

MS. BLACK: The order is for $66 a week. The arrears are $6807.34. The last date of payment was March 26th of '96, and it was for $1,837.66.

THE COURT: Was that—

**332**

MS. BLACK: It came from another state, so I imagine it was probably income tax [refund] money.

THE COURT: Any questions you have of Ms. Black?

[DEFENSE COUNSEL]: Yes."

Upon cross-examination, Sharon Black stated that the defendant was working at the "Food Bank of Delaware" in August 1995, that there was a wage attachment for support "for $82.50, $66 current and $16.50 on the arrears" in September 1995, and that he stopped working for the "Food Bank" on January 30, 1996, and that she had no information as to why he stopped working then. She also testified that she had no information about any employment since that time, and that she did not know "whether he is capable of working or not capable of working."

The defendant Dorsey testified that he was not then employed, that he had been incarcerated at the Cecil County Detention Center since June 10, 1997, and that he was not eligible for work release because there were criminal charges pending against him. Dorsey testified that his last "full time" employment was for two months "of last year" for the Allen Trucking Company in Virginia, that he cleaned out trailers for the company, and that this employment ceased when "the company folded."

Dorsey further testified, and Sharon Black confirmed, that his last support payment was in February 1996 when "payment of $165.00 through a wage attachment" was made, that he was then working as a driver for the "Blood Bank of Delaware," and that this employment in Delaware terminated when his driver's license was suspended. He stated that his only other employment over the past year was that he "worked at Wendy's for a couple of weeks." Dorsey further testified that, during the remainder of the time period between the initial support order and the August 20, 1997, trial, he was either incarcerated in Delaware or Maryland or, when not incarcerated, he was unable to find work.

After the above-summarized testimony, the following colloquy occurred:

"THE COURT: What kind of support did you have to pay at Wendy's?

THE DEFENDANT: None. I had to take care of my five kids. Not that much money at Wendy's.

THE COURT: What about the kid you have here?

THE DEFENDANT: I understand, sir.

THE COURT: What did you do from August of '96 until June of '97? That's 10 months.

THE DEFENDANT: Nothing basically.

THE COURT: Nothing?

THE DEFENDANT: No.

THE COURT: What kind of money do you have on you?

THE DEFENDANT: I have none.

THE COURT: I am going to convert this. I think there is probable cause to believe, especially for 10 months doing nothing, I am going to convert this to a criminal case.

[DEFENSE COUNSEL]: Judge, before you do that, have they—has it been proven he has a present ability to pay today? That's what civil contempt is about?

THE COURT: I am going to dismiss the civil contempt and convert it to a criminal case.

[DEFENSE COUNSEL]: When are we trying that?

THE COURT: I will try it today on a 179 day hold."

Dorsey's attorney then raised a question about the adequacy of "notice when we are doing these things" and about Dorsey's entitlement to a jury trial. The trial judge ruled that Dorsey was not entitled to a jury trial because "I will limit [the sentence] to 179 days." The judge also indicated that he would grant a postponement, although Dorsey would have to remain in jail unless he could post bail. When defense counsel raised a question about the absence of a prosecutor, the judge stated that he "would go ahead and let it proceed without a prosecutor." In response to the defense attorney's inquiry about a "purge amount," the trial judge stated:

"You handle the purge by doing a motion for reduction of sentence, at which point the court can grant or not grant, or

the court can do its own motion on that. You can argue for a purge. There is even a provision, I can dismiss charges prior to trial if so much is paid."

Dorsey himself then decided against a postponement. Immediately thereafter, the court advised Dorsey of his right to counsel, stated again that Dorsey had no right to a jury trial, informed him that the maximum sentence would be 179 days, informed him of his "right to testify ... after the state presents its evidence or not testify," advised him that, if he decided to testify, he would be subject to cross-examination by the judge, and told him that his failure to testify would not be used against him.

Following the court's advice to Dorsey, Sharon Black was again called as a witness. She stated that the support order was for current support of $66.00 per week plus $16.50 per week "for arrears," that the "arrears at this time are $6807.34," that the "last date of payment was March 26th of '96, and [the] payment was $1837.66," and that there was a payment of $165.00 in February 1996 from a wage attachment. Sharon Black also testified that her records indicated that Dorsey worked for a trucking company in February and March 1996. In response to a question by the court, Sharon Black stated that her records contained no evidence that he was disabled or unable to work.

Upon cross-examination, Sharon Black stated that the agency's records contained no information concerning Dorsey between March 1996 and his appearance in court pursuant to a bench warrant in July 1997. She said that mail sent to the addresses listed for Dorsey was returned by the Post Office. Other than the records indicating no support payments after March 1996 and Dorsey's alleged failure to inform the agency of a change of address, Sharon Black said that she had no knowledge "as to whether his failure to pay child support was willful on his part." Finally, she testified that she did not know whether the agency took any steps, beyond sending letters that were returned, to locate Dorsey or to determine

why no child support had been paid between March 1996 and July 1997.

At the conclusion of Sharon Black's testimony, defense counsel moved for judgment of acquittal on the ground that the evidence was insufficient to show that Dorsey willfully refused to pay child support or that he had the ability to pay child support. The court denied the motion, stating that "[a]ll they have to prove [is that] he failed to pay his child support." The court further stated that "I can assume he was able to" pay child support. In response to defense counsel's further argument that there was no evidence of willfulness or criminal intent, and that the defendant need not establish a lack of willfulness or an inability to pay, the court reiterated:

"All the state has to show to get a prima facie case [is that] he was supposed to pay support, he didn't pay support, and they are not aware of any reason why he didn't pay support."

Dorsey elected not to testify, and defense counsel again moved for judgment of acquittal, arguing that the evidence was insufficient to show either willfulness or that Dorsey had the ability to pay.

The court then found that, for the ten-month period between August 1996 and Dorsey's incarceration in June 1997, there was sufficient evidence of Dorsey's willful refusal to pay child support. The court based this finding upon the lack of any support payments during this period, the lack of employment information in the agency's records for the period, and Dorsey's apparent failure to notify the agency of a change of address.

The court found Dorsey guilty of criminal contempt and sentenced him to 179 days in the Cecil County Detention Center, "live-in/work-out," with credit for the time he was incarcerated from July 29, 1997. The court continued:

"Note for the record, the docket entries, the Court, on its own motion makes a motion for reduction of sentence and will reduce the sentence to zero or release him from imprisonment upon payment of $2300. So that in effect is the

criminal purge amount. So you don't have to file for reduction of sentence, it's on the record."

Dorsey noted an appeal to the Court of Special Appeals. Prior to any proceeding in the intermediate appellate court, Dorsey filed in this Court a petition for a writ of certiorari which we granted. *Dorsey v. State,* 348 Md. 334, 703 A.2d 1265 (1998). The questions presented by Dorsey are whether he was entitled to a jury trial, whether the charging document violated the requirements of due process and the Maryland Rules of Procedure, whether the court erred "by 'converting' the case from civil to criminal contempt in the middle of the hearing," whether the court, by "assum[ing]" that Dorsey had the ability to pay, improperly placed the burden on Dorsey to prove an inability to pay child support during the pertinent ten-month period, and whether the court's findings of willfulness and ability to pay during the pertinent period were clearly erroneous in light of the evidence.

## B. *Craft v. State*

On May 11, 1993, the Circuit Court for Cecil County ordered that Lawrence L. Craft pay $73.00 per week for the support of his child, Michael Craft. Almost four years later, on February 5, 1997, a "petition for civil contempt" and a separate "petition for criminal contempt" were simultaneously filed against Lawrence Craft in the Circuit Court for Cecil County. Each petition alleged that Craft had not complied with the 1993 support order and that, as of February 5, 1997, he was in arrears in the amount of $4610.00.

When the case was called for trial on February 19, 1997, the trial judge initially announced that "punishment is limited to 179 days." The assistant public defender representing Craft then "demand[ed] a jury trial for my client," and the trial judge denied the demand. Next, the following colloquy occurred:

"[DEFENSE COUNSEL]: Are we proceeding civilly or criminally?

THE COURT: Criminally.

■■■■■■■■■■■■■■■■■■■■■ **337**

THE COURT: No, excuse me. We are proceeding both. We can do these combined under the new rules.[3]

[DEFENSE COUNSEL]: Let me proffer to the Court then that my client has been in a situation where he cannot work to the level he was working before. He was a truck driver and welder, lost his license due to a series of DUIs, is not able to work, and is doing telemarketing out of his basement. Actually, he is renting a room in a basement and doing telemarketing from there, because he can't drive to work. He doesn't have a license and he is not able to get better employment. So he is under-employed at this point.

He has done almost everything he can or almost everything he has to do to get a license back. And I have a series of copies of documents to show to the Court that he has been doing everything.

* * *

[DEFENSE COUNSEL]: He doesn't want to deny his children ... support. I mean, he's willing to pay the support. He is willing to pay the arrears; it's just a matter of not having present ability to pay. He lost his job in March or April of 1996, made a last payment in June '96."

THE COURT: Lost job March or April 1996. Last payment June of '96.

[DEFENSE COUNSEL]: That's according to Mr. Deruggiero[, the representative of the Cecil County Child Support Enforcement Agency]. I have some documents which support this. We are prepared to put on testimony

---

3. Maryland Rule 15–207(a) states as follows:

"(a) *Consolidation of criminal and civil contempts.* If a person has been charged with both constructive criminal contempt pursuant to Rule 15–205 and constructive civil contempt pursuant to Rule 15–206, the court may consolidate the proceedings for hearing and disposition."

The petitioner Craft has not in the present case challenged this rule on due process or other constitutional grounds, and, therefore, no issue concerning the rule's validity is before us.

that he has been going to AA. First of all, he went through the program in Delaware City. Then ... in Wilmington. That's the letter the court has. I'll explain those in a moment.

THE COURT: All right. Go ahead Mr. Deruggiero.[4]

MR. DERUGGIERO: Your Honor, basically what you said the last payment was June the 6th 1996. His current arrears are $4,726. The order is $73 a week. Now, he did lose his job in April of '96. We came across a new address on him in January, that's what brought the case back to court because we had a bad address on him and we found a new one and did the summons for today. He did work at Dana Rail Car in December....

THE COURT: Where did he work? He worked where?

MR. DERUGGIERO: Dana Rail Car. Worked there about a year, from what I can see.

THE COURT: In January of '96?

MR. DERUGGIERO: No, sir. * * * He left there in December of '95. And then he was summoned to court for April of '96. He says [that he was] working as a subcontractor with his cousin laying carpet. [He] will continue to make the $91 a week payments.

THE COURT: Worked as a subcontractor.

MR. DERUGGIERO: Subcontractor with his cousin as a carpet layer which he continued—he made a lump sum payment of $274. Continue to make the $91 a week payments. I took him off the court list on April the 24th based on that information.

THE COURT: Then what happened?

MR. DERUGGIERO: We apparently had lost contact with him. We had a bad address, unable to locate him. Then in January we did get a new address and he was

---

4. Neither Mr. Deruggiero nor defense counsel were sworn as witnesses. In fact, there was no sworn testimony at the "trial." Although documents are referred to and contained in the file, there is no indication from the record that these documents were ever admitted into evidence.

resummonsed for court. Then he came into my office telling me about his doing the telemarketing where he gets one dollar for each pick up if the person agrees to leave something out for the group, he gets a dollar for every pick up that's made. Told me he paid $200 a month rent. Going to the AA and then his case was brought here for court.

THE COURT: Any questions for Mr. Deruggiero?

[DEFENSE COUNSEL]: No, Your Honor."

The court then asked defense counsel, "What do you want to tell us?" Counsel responded:

"[DEFENSE COUNSEL]: Well, I mean, he would testify that he has not been able to work to full capacity since he lost his driver's license. He was a truck driver and welder, worked at companies like Dana Rail Car Company as I believe making, I think you were making $14 an hour. That was the money he was making when this occurred. Then with the DWI, he lost his license. He had reported to the 28-day program and quite frankly sounds like he worked very hard at maintaining his sobriety. A neighbor takes him to AA. He has remained alcohol free. And the letter from the NET counseling . . . says that all urinalysis have been clear. . . . [O]nce he gets his license back, he will be able to get employment for instance with this contracting service or something else to where he did before and he be at a level where he can pay the full amount. Presently—

THE COURT: How come he hasn't paid anything since June?

[DEFENSE COUNSEL]: Well, he pays $75 a week for this room in the basement. He makes $80 to $100 a week. He uses the rest to eat. He has no hobbies. He has no cable. His television and telephone usage are included in his rent."

The trial judge suggested that Craft could get a job near his residence "and probably make $240 a week working at one of the fast food places." The judge next asked, "Does he have any assets?" Lawrence Craft himself answered: "No, sir. Just clothes, TV and a small stereo, basically." The court

then asked whether Craft wanted to testify, and defense counsel replied: "No. Nothing further." Defense counsel proceeded to argue that Craft at no time had the ability to pay more than he did, and that, therefore, he had not willfully violated the support order.

Thereafter, the trial court concluded:

"Well, I'll grant you he doesn't have the ability to pay civilly but I'm convinced beyond a reasonable doubt he is guilty of criminal contempt. He just hasn't done anything since 6/6/96 as far as paying for the children. He has had a job that is basically less than minimum wage. * * * He had a duty to go out and do something and he didn't do anything. So guilty of criminal contempt."

The Court sentenced Craft to 179 days in the Cecil County Detention Center with credit for the 14 days served between February 5 and February 19, 1997. The Court "on its own motion" filed a motion for reduction of sentence, and stated: "If you pay $1,500, I'll reduce sentence to time served."

Craft immediately noted an appeal to the Court of Special Appeals. A few days later, on February 25, 1997, he paid $1,500.00, and the circuit court ordered that he be released from jail.

The Court of Special Appeals, in an unreported opinion, affirmed the judgment of the circuit court. The intermediate appellate court held that Craft was not entitled to a jury trial. It further held that Craft had waived his complaint about being convicted without any sworn testimony because his counsel failed to object on this ground and because "his own counsel was the first to proceed by proffer." Treating the unsworn statements of the agency representative and defense counsel as evidence, the Court of Special Appeals held that these statements "and the documentation were sufficient to support the court's finding of criminal contempt."

Thereafter, this Court granted Craft's petition for a writ of certiorari. *Craft v. State,* 348 Md. 334, 703 A.2d 1265 (1998). Craft argues that, as a matter of Maryland law, he was entitled to a jury trial, that he should not have been convicted

on the basis of unsworn statements, and that, even treating the unsworn statements as evidence, such "evidence" was insufficient to convict him of criminal contempt.

## II.

In arguing that they were entitled to jury trials in these constructive criminal contempt prosecutions, Dorsey and Craft principally rely upon the state constitutional right to a jury trial guaranteed under Articles 5 and 21 of the Maryland Declaration of Rights, and upon this Court's opinions applying those constitutional provisions.[5] *See, e.g., State v. Huebner,* 305 Md. 601, 505 A.2d 1331 (1986); *Fisher v. State,* 305 Md. 357, 504 A.2d 626 (1985); *Kawamura v. State,* 299 Md. 276, 473 A.2d 438 (1984); *Danner v. State,* 89 Md. 220, 42 A. 965 (1899).

The State, relying upon cases involving either the *federal* constitutional right to a jury trial, or *direct* criminal contempt, or *civil* contempt, argues that Maryland law grants no right to a jury trial in a constructive criminal contempt case unless the trial court imposes a sentence of imprisonment in excess of six months. *See, e.g., Codispoti v. Pennsylvania,* 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1974) (involving direct criminal contempt and the right to a jury trial under the Sixth Amendment to the federal constitution); *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974) (same); *Mitchell v. State,* 320 Md. 756, 580 A.2d 196 (1990) (direct criminal

---

**5.** Article 5(a) of the Maryland Declaration of Rights states in pertinent part as follows:

"That the Inhabitants of Maryland are entitled to the Common Law of England, and the trial by Jury, according to the course of that Law...."

Article 21 of the Maryland Declaration of Rights provides as follows:
"That in all criminal prosecutions, every man hath a right to be informed of the accusation against him; to have a copy of the Indictment, or charge, in due time (if required) to prepare for his defence; to be allowed counsel; to be confronted with the witnesses against him; to have process for his witnesses; to examine the witnesses for and against him on oath; and to a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty."

contempt); *Whitaker v. Prince George's County*, 307 Md. 368, 387–388, 514 A.2d 4, 14–15 (1986) (civil contempt); *Wilkins v. State*, 293 Md. 335, 444 A.2d 445 (1982) (direct criminal contempt).

This Court has not previously decided, either under the Maryland Constitution or as a matter of Maryland non-constitutional law, whether the defendant has a right to a jury trial in a constructive criminal contempt prosecution in a circuit court, regardless of the sentence actually imposed. Consistent with "the established principle that a court will not decide a constitutional issue when a case can properly be disposed of on a non-constitutional ground," *Telnikoff v. Matusevitch*, 347 Md. 561, 579 n. 15, 702 A.2d 230, 239 n. 15 (1997),[6] we shall initially address the question of whether the petitioners Dorsey and Craft were entitled to jury trials as a matter of state non-constitutional law. Since we shall hold that the petitioners had a statutory right to jury trials in the instant cases, we need not and shall not reach the issue of whether they were entitled to jury trials under Articles 5 and 21 of the Maryland Declaration of Rights. *See 3011 Corp. v. District Court*, 327 Md. 463, 468, 610 A.2d 766, 769 (1992) (because "the defendant corporations have a statutory right to a jury trial . . . , we shall not reach the state and federal constitutional issues argued by the parties").

Preliminarily, we shall briefly reiterate what this Court has said about criminal contempt and particularly about constructive criminal contempt. As Judge McAuliffe pointed out for the Court in *Mitchell v. State, supra*, 320 Md. at 761, 580 A.2d at 199, "[c]riminal contempt is a crime in every fundamental respect" and due process principles "will ordinarily require that a person charged with criminal contempt be given certain fundamental rights available to a defendant in any

---

**6.** *See also, e.g., Div. of Corrections v. Henderson*, 351 Md. 438, 451, 718 A.2d 1150, 1156 (1998); *Professional Staff Nurses v. Dimensions Health Corp.*, 346 Md. 132, 138–139, 695 A.2d 158, 161 (1997); *Insurance Commissioner v. Equitable*, 339 Md. 596, 614, 664 A.2d 862, 871 (1995); *State v. Lancaster*, 332 Md. 385, 404 n. 13, 631 A.2d 453, 463 n. 13 (1993), and cases there cited.

other criminal case . . . . " We went on in *Mitchell* to point out that "[a] long-established exception exists, however, in the case of direct contempt." *Ibid.* The reason for this exception in the case of *direct* criminal contempt is the "necessity to scale back ordinary due process rights in favor of prompt and effective action necessary to address a disruption that threatens the proceedings. * * * The courts must, and do, have the power to deal promptly and decisively with blatantly contemptuous conduct of the type that occurred here" which was "in a courtroom." *Mitchell,* 320 Md. at 762–763, 580 A.2d at 199. While there need be an exemption to ordinary criminal process in order to punish summarily direct contempt, such exception is not required in the case of constructive criminal contempt.

Judge J. Dudley Digges for the Court, in *State v. Roll and Scholl,* 267 Md. 714, 731, 298 A.2d 867, 877 (1973), explained that a constructive criminal contempt prosecution, in contrast to a civil contempt proceeding, has the characteristics of any other criminal case, in that

> "additional criminal safeguards are available to [the accused]. The burden of proof is increased, the accused cannot be compelled to testify against himself, he cannot be put in double jeopardy, and, except when a contempt may be dealt with summarily [*i.e.,* direct criminal contempt], the panoply of fundamental due process rights comes into play."

*See, e.g., In re Ann M.,* 309 Md. 564, 568–569, 525 A.2d 1054, 1056 (1987) (criminal contempt is a "common law offense" which "arises from a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court"); *Giant of Md. v. State's Attorney,* 274 Md. 158, 176, 334 A.2d 107, 117–118 (1975) ("when the contempt is charged as criminal in nature, and the conduct is not shown to be plainly contemptuous on its face, proof beyond a reasonable doubt that the alleged contemnor possessed a contumacious intent is a necessary ingredient for an adjudication of guilt"); Maryland Rules 15–205 and 15–208 (largely treating construc-

tive criminal contempt like other criminal actions with regard to the initiation of prosecution, waiver of counsel, waiver of jury trial, and bail).

Turning to the right to a jury trial, in *Thompson v. State*, 278 Md. 41, 49, 359 A.2d 203, 207 (1976), this Court flatly held, as a matter of Maryland common law, that "where a defendant is charged with a crime in a court of general common law jurisdiction, and where no legislative enactment restricts his right to a jury trial, ... he is entitled to ... trial by jury." Later in our *Thompson* opinion, 278 Md. at 51, 359 A.2d at 209, we reiterated that a legislative enactment "must specifically direct that an offense is to be tried summarily. Otherwise trial is to be ... by jury," unless the defendant waives his right to a jury trial. The defendant in *Thompson* was being tried at the circuit court level for certain violations of the motor vehicle laws. We pointed out that, while "it may be constitutional" under some circumstances to deny a defendant trial by jury in a circuit court criminal case, no legislative enactment applicable to the case before the court did so and that, therefore, the defendant was entitled to a trial by jury. *Thompson*, 278 Md. at 52, 359 A.2d at 209.

The question of a right to a jury trial in one type of circuit court criminal proceeding was expressly reserved in *Thompson*, namely the "right to a jury trial in the circuit court upon a *de novo* appeal from a District Court criminal conviction," 278 Md. at 53–54 n. 5, 359 A.2d at 210 n. 5. This reserved issue was specifically resolved in *Hardy v. State*, 279 Md. 489, 369 A.2d 1043 (1977). The Court in *Hardy* first repeated the *Thompson* holding that, under Maryland common law, a defendant charged with a crime in a circuit court is entitled to trial by jury regardless of "whether the offense be deemed 'petty' or not." *Hardy*, 279 Md. at 492, 369 A.2d at 1046. We next pointed out that appeals from District Court criminal convictions are by statute ordinarily tried in a circuit court "de novo," which means "as wholly original proceedings," 279 Md. at 493, 369 A.2d at 1046. Consequently, we held in *Hardy* that "the Legislature intended that the appeal [from a District Court criminal conviction] be treated as an original circuit

court proceeding with the right to a jury trial." 279 Md. at 494–495, 369 A.2d at 1047.

The General Assembly addressed the holdings in the *Thompson* and *Hardy* cases by Ch. 298 of the Acts of 1980, effective July 1, 1980. Ch. 298 added new section 593A to Art. 27 of the Code and new subsection (e) to § 12–401 of the Courts and Judicial Proceedings Article of the Code. Section 1 of Ch. 298 stated as follows:

"SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That section(s) of the Annotated Code of Maryland be repealed, amended, or enacted to read as follows:

Article 27—Crimes and Punishments

593A

IN A CRIMINAL CASE TRIED IN A COURT OF GENERAL JURISDICTION, THERE IS NO RIGHT TO A JURY TRIAL UNLESS THE OFFENSE CHARGED IS SUBJECT TO A PENALTY OF IMPRISONMENT FOR A PERIOD IN EXCESS OF 30 DAYS, OR UNLESS THERE IS A CONSTITUTIONAL RIGHT TO A JURY TRIAL FOR THAT OFFENSE.

Article—Courts and Judicial Proceedings

12–401

(E) IN A CRIMINAL APPEAL THAT IS TRIED DE NOVO, THERE IS NO RIGHT TO A JURY TRIAL UNLESS THE OFFENSE CHARGED IS SUBJECT TO A PENALTY OF IMPRISONMENT FOR A PERIOD IN EXCESS OF 30 DAYS, OR UNLESS THERE IS A CONSTITUTIONAL RIGHT TO A JURY TRIAL FOR THAT OFFENSE."

What was § 12–401(e) is now codified as § 12–401(g) of the Courts and Judicial Proceedings Article.

Under Ch. 298 of the Acts of 1980, therefore, in any circuit court criminal case, whether under the court's original jurisdiction or under the court's de novo appellate jurisdiction, the

**346**

defendant is entitled to a jury trial if the offense charged is subject to imprisonment. Ch. 298 basically adopted the holdings in *Thompson* and *Hardy*, but excluded from the jury trial right only those offenses which carried no penalty of imprisonment whatsoever. *See Kleberg v. State*, 318 Md. 411, 415, 568 A.2d 1123, 1125 (1990) (because the crime charged "is an offense subject to two months imprisonment, a right to a jury trial attaches to that offense" in a circuit court trial).

■ Although Maryland Rule 15–203 has the effect of creating an exception to Ch. 298 for direct criminal contempts summarily punished by the trial judge, there is no rule or statute creating an exception for other types of criminal contempt proceedings.[7] Accordingly, we have held that Ch.

7. Maryland Rule 15–203 provides in part as follows:

"RULE 15–203. DIRECT CIVIL AND
CRIMINAL CONTEMPT
"(a) Summary Imposition of Sanctions. The court against which a direct civil or criminal contempt has been committed may impose sanctions on the person who committed it summarily if (1) the presiding judge has personally seen, heard, or otherwise directly perceived the conduct constituting the contempt and has personal knowledge of the identity of the person committing it, and (2) the contempt has interrupted the order of the court and interfered with the dignified conduct of the court's business. The court shall afford the alleged contemnor an opportunity, consistent with the circumstances then existing, to present exculpatory or mitigating information. If the court summarily finds and announces on the record that direct contempt has been committed, the court may defer imposition of sanctions until the conclusion of the proceeding during which the contempt was committed."

＊ ＊ ＊

Rule 15–204 states as follows:
RULE 15–204. DIRECT CONTEMPT
IF NO SUMMARY IMPOSITION
OF SANCTIONS
"In any proceeding involving a direct contempt for which the court determines not to impose sanctions summarily, the judge, reasonably promptly after the conduct, shall issue a written order specifying the evidentiary facts within the personal knowledge of the judge as to the conduct constituting the contempt and the identity of the contemnor. Thereafter, the proceeding shall be conducted pursuant to Rule 15–205 or Rule 15–206, whichever is applicable, and Rule 15–207 in the same manner as a constructive contempt."

298 of the Acts of 1980 and the *Thompson/Hardy* principle apply to other types of circuit court criminal contempt proceedings.

In *Harper v. State*, 312 Md. 396, 540 A.2d 124 (1988), at the conclusion of a District Court preliminary hearing, the defendant Harper was engaged in an altercation with several law enforcement officers in the courtroom and in the presence of the trial judge. The trial judge immediately found Harper in contempt of court and summarily imposed a sentence of ninety days imprisonment. Harper appealed to the Circuit Court for Baltimore City and elected a de novo trial before a jury. The circuit court rejected Harper's request for a jury trial, held that the appeal would be on the record, and affirmed the contempt conviction. This Court granted Harper's petition for a writ of certiorari and reversed, holding that he was entitled to a circuit court trial de novo. We further held that, "[a]s direct criminal contempt is subject to a penalty of imprisonment, [Ch. 298 of the Acts of 1980] grants a right to a jury trial on the de novo appeal." *Harper v. State, supra,* 312 Md. at 400, 540 A.2d at 126. In response to the State's argument that Ch. 298, then codified in part as § 12–401(e) of the Courts and Judicial Proceedings Article, was inapplicable to criminal contempt cases, we stated: "If we were to construe . . . 12–401(e) as excluding criminal contempt cases, we would be inserting an exception not made by the General Assembly." *Harper,* 312 Md. at 404, 540 A.2d at 127. We further held that if Ch. 298 were inapplicable to criminal contempt cases, Harper would still be entitled to a jury trial in the circuit court under the *Thompson/Hardy* principle. *Harper,* 312 Md. at 406–407, 540 A.2d at 129. Finally, we held in *Harper,* 312 Md. at 408–409, 540 A.2d at 130, that " 'the need for immediate vindication of the dignity of the court' " did not justify a court-

---

Under federal constitutional requirements, a sentence of imprisonment summarily imposed, without a jury trial or waiver of a jury trial, for direct criminal contempt cannot exceed six months. *Mitchell v. State,* 320 Md. 756, 760 n. 1, 580 A.2d 196, 198 n. 1 (1990); *Wilkins v. State,* 293 Md. 335, 338–341, 444 A.2d 445, 446–448 (1982).

created exception to the statutory scheme granting the defendant a right to a circuit court jury trial.

■ Similarly, while the need for immediate vindication of the dignity of the court justifies the immediate summary punishment by a trial judge of direct criminal contempt, such need furnishes no ground for a court-created exception, in a constructive criminal contempt case, to the statutory jury trial rights under Ch. 298 of the Acts of 1980, now codified as Art. 27, § 593A, and § 12–401(g) of the Courts and Judicial Proceedings Article.

The petitioners Dorsey and Craft were entitled to jury trials under Ch. 298 of the Acts of 1980, and the Circuit Court for Cecil County erred in denying their requests for jury trials.

### III.

■ The petitioner Dorsey argues that the "combined charging document filed in this case did not properly charge Mr. Dorsey with criminal contempt," that "the rules do not authorize combined charging documents for civil and criminal contempt," and that there is no authority for "a mid-hearing 'conversion' from civil to criminal contempt." (Petitioner Dorsey's brief at 20–22). According to Dorsey, the procedure utilized violates principles of due process as well as the Maryland Rules of Procedure. We agree.

Article 21 of the Maryland Declaration of Rights guarantees "[t]hat in all criminal prosecutions, every [person] hath a right to be informed of the accusation against him" and "to have a copy of the ... charge, in due time ... to prepare for his defence...." [8] Maryland Rule 15–205(d) requires, in a constructive criminal contempt case, the filing and service upon the defendant of a charging document containing the information required by Rule 4–202(a).[9] Rule 4–202(a) provides, *inter*

---

8. *See* note 5, *supra.*

9. Rule 15–205(d) states:

*alia,* that a charging document "shall contain a concise and definite statement of the essential facts of the offense with which the defendant is charged and, with reasonable particularity, the time and place the offense occurred." Rule 4–202(a) goes on to require, *inter alia,* that the charging document notify the defendant that he is charged "with committing a crime." [10]

It is obvious that the petition in the *Dorsey* case did not comply with the above-quoted provisions. As neither the "Criminal" paragraph nor the "Civil" paragraph of the petition were checked or otherwise marked, the petition utterly failed to notify Dorsey that he was being charged with a crime, much less notify him of the nature of the particular offense.

---

*"(d) Contents; Service.* An order filed by the court pursuant to section (b)(1) of this Rule and a petition filed by the State's Attorney, the Attorney General, or the State Prosecutor shall contain the information required by Rule 4–202(a). The order or petition shall be served, along with a summons or warrant, in the manner specified in Rule 4–212 or, if the proceeding is in the Court of Appeals or Court of Special Appeals, in the manner directed by that court."

**10.** Rule 4–202(a) provides in pertinent part as follows:

"**RULE 4–202. CHARGING DOCUMENT—
CONTENT**

*"(a) General Requirements.* A charging document shall contain the name of the defendant or any name or description by which the defendant can be identified with reasonable certainty, except that the defendant need not be named or described in a citation for a parking violation. It shall contain a concise and definite statement of the essential facts of the offense with which the defendant is charged and, with reasonable particularity, the time and place the offense occurred. An allegation made in one count may be incorporated by reference in another count. The statute or other authority for each count shall be cited at the end of the count, but error in or omission of the citation of authority is not grounds for dismissal of the charging document or for reversal of a conviction.

"A charging document also shall contain a notice to the defendant in the following form:

"TO THE PERSON CHARGED:

1. This paper charges you with committing a crime.

2. If you have been arrested, you have the right to have a judicial officer decide whether you should be released from jail until your trial.

3. You have the right to have a lawyer."

\* \* \*

■ Moreover, although Rule 15–207(a) authorizes the consolidation for hearing of a constructive criminal contempt case and a constructive civil contempt case, nothing in the rules authorizes a combined single charging document. Rules 15–205 and 4–202(a) specify the nature and contents of a charging document initiating a constructive criminal contempt prosecution. Rule 15–206 sets forth the entirely different requirements concerning the nature and contents of a petition initiating a constructive civil contempt proceeding. The rules contemplate different types of petitions for constructive criminal contempt prosecutions and constructive civil contempt proceedings. A combined single petition is simply not permitted.

■ Finally, there is no authority in the rules or in this Court's decisions to convert, at mid-trial, a constructive civil contempt trial into a constructive criminal contempt trial. The circuit court apparently relied upon a passage in this Court's opinion in *State v. Roll and Scholl, supra,* 267 Md. at 730, 298 A.2d at 877, and the respondent before this Court relies upon the same passage. The Court stated in *Roll and Scholl* (267 Md. at 730, 298 A.2d at 877):

"Situations may arise where at a hearing held pursuant to an order to show cause in what properly began as a civil contempt, facts are presented which indicate that the alleged contemnor cannot comply with the order of the court that directed him to perform an act for the benefit and advantage of another party to the suit. If this inability to comply was caused by a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court, the civil contempt proceeding should be terminated and new proceedings may be instituted which can result in a finding of criminal contempt."

*See also Lynch v. Lynch,* 342 Md. 509, 522, 677 A.2d 584, 591 (1996).

The above-quoted passage from *Roll and Scholl* does not authorize a mid-trial conversion from a civil contempt proceed-

ing to a criminal contempt proceeding. Instead, the Court in *Roll and Scholl* stated that, under the circumstances referred to, "the civil contempt proceeding should be *terminated*" and "*new* proceedings may be instituted." (Emphasis added). The institution of new constructive criminal contempt proceedings, requires, *after* the termination of the civil proceedings, the bringing of a new criminal case in accordance with Rules 15–205 and 4–202(a) relating to the appropriate prosecutor, charging documents, notice, service, right to jury trial, etc. Compliance with Rules 15–205 and 4–202(a) obviously requires some time lag between the termination of an exclusively civil contempt proceeding and the trial of a new constructive criminal contempt case.

## IV.

As previously mentioned, both Dorsey and Craft argue that the evidence was insufficient to establish constructive criminal contempt. Dorsey also argues that the circuit court, by "assum[ing]" that Dorsey had the ability to pay, improperly placed the burden on him to disprove an element of the offense, namely to show an inability to pay during the pertinent time period. Craft also argues that the evidence in his case was not merely insufficient; instead, according to Craft, there was utterly no evidence of his guilt because all of the "testimony" was unsworn.

## A.

In the *Dorsey* case, although the circuit court may not have been justified in "assum[ing]" an ability to pay, the court did not impose a burden on Dorsey to disprove an element of the offense. While present inability to comply with the court order or the purging provision is traditionally a defense in a constructive civil contempt case, *Lynch v. Lynch, supra,* 342 Md. at 520–529, 677 A.2d at 589–594; *Elzey v. Elzey,* 291 Md. 369, 374–376, 435 A.2d 445, 448 (1981), ability to comply is not an element of, and inability to comply is not a defense to, constructive criminal contempt.

**352**

The prosecution, in order to convict an accused of constructive criminal contempt, has the burden of proving, beyond a reasonable doubt, "a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court," *In re Ann M., supra,* 309 Md. at 569, 525 A.2d at 1056. *See also Giant of Md. v. State's Attorney, supra,* 274 Md. at 176, 178, 334 A.2d at 118 ("[P]roof beyond a reasonable doubt that the alleged contemnor possessed a contumacious intent is a necessary ingredient for an adjudication of guilt. * * * [There must be] evidence to support the finding that [defendant's] conduct had been deliberate, knowing and willful"); *State v. Roll and Scholl, supra,* 267 Md. at 730, 298 A.2d at 877 (for a finding of criminal contempt, the failure or inability to comply with the court order must be "caused by a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court"). These mens rea elements must be established by evidence, and cannot simply be "assumed." Nevertheless, like scienter generally in criminal cases, they "may be proven by circumstantial evidence and by inferences drawn therefrom." *Dawkins v. State,* 313 Md. 638, 651, 547 A.2d 1041, 1047 (1988).

While ability to comply with a court order at the time of the alleged criminal contempt is not directly an element of the offense, evidence of an ability to comply, or evidence of a defendant's conduct purposefully rendering himself unable to comply, may, depending on the circumstances, give rise to a legitimate inference that the defendant acted with the requisite willfulness and knowledge. By contrast, evidence of an inability to comply during the relevant period may, again depending upon the circumstances, support an inference that the defendant lacked a contumacious intent. *See Lynch v. Lynch, supra,* 342 Md. at 528–529, 677 A.2d at 594 ("Whether a defendant has failed to pay court ordered support when he or she had the ability to do so and whether that defendant has, in bad faith, caused his or her own ... inability to comply, with the intent of frustrating the court

order, are material, and indeed, necessary, considerations bearing on whether the defendant should be punished" for criminal contempt).

To reiterate, while the trial court may have lacked any evidentiary basis for assuming that Dorsey had the ability to pay from August 1996 until June 1997, and may have erred by indulging in such assumption, the court did not thereby impose upon the defendant the burden of disproving an element of the offense.

### B.

Except for cases tried on agreed statements of facts, defendants pleading not guilty " 'should not be allowed to be convicted on the basis of unsworn testimony.' " *Bradley v. State*, 333 Md. 593, 602 n. 4, 636 A.2d 999, 1003 n. 4 (1994), quoting *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir.1975). *See Bridges v. Wixon*, 326 U.S. 135, 153–154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103, 2115 (1945) (to "allow men to be convicted on unsworn testimony of witnesses [is] a practice which runs counter to the notions of fairness on which our legal system is founded"); *United States v. Hawkins*, 76 F.3d 545, 550–551 (4th Cir.1996) (criminal contempt conviction vacated because trial judge relied on the unsworn "testimony" of an Assistant United States Attorney).

In the *Craft* case, none of the "testimony" was sworn, and the documents were not admitted into evidence.[11] There was no suggestion that the parties were proceeding on an agreed statement of facts or on stipulated facts. It is not simply a case where the evidence was arguably insufficient. Instead, Craft was convicted of a serious crime based on absolutely no evidence.

---

11. The eight documents in the file did not particularly help the prosecution's case. They consisted of a letter from a company with whom Craft sought employment and stating that no positions were available, a letter showing Craft's participation in counseling, three earning statements, and three receipts for support payments in the amount of $300.00 each.

Although Craft's counsel argued that the evidence was insufficient, counsel made no objection to the unsworn statements and, in fact, began by making a "proffer." Because of this, the State argues and the Court of Special Appeals held that any complaint based on the unsworn nature of the "testimony" was not preserved for review on appeal. Craft counters that the failure to object to the unsworn statements of the agency "prosecutor" and the defense counsel does not convert those statements into evidence. We need not resolve this issue in the present case. Even if we treat the unsworn testimony as evidence, such "evidence," as we discuss below, was insufficient to find that Craft was guilty of criminal contempt.

## C.

It was undisputed in both the *Dorsey* case and the *Craft* case that the defendants had failed to comply with the support orders during periods in the past. The issue before the circuit court in each case was whether the failure to comply, or a past inability to comply, arose "from a deliberate effort or a wilful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court," *In re Ann M., supra,* 309 Md. at 569, 525 A.2d at 1056. And, as discussed earlier, the State had the burden of establishing this requisite mens rea.

The circuit court in *Dorsey* held that the defendant was guilty of criminal contempt during the period from August 1996 until June 1997. This verdict was based on the lack of support payments for that ten-month period, the lack of employment information in the agency's records, and the fact that the agency's records reflected an incorrect address for Dorsey. These facts, however, are entirely insufficient to support an inference that Dorsey's failure to make support payments during the period was willful and done with a contumacious intent. The only evidence relating to the period was Dorsey's testimony that he worked "a couple of weeks at Wendy's," that the pay was "[n]ot that much," and that, during

the remainder of the period since August 1996, he was either incarcerated or, when not incarcerated, he was unable to find work and "basically" did "nothing." This testimony does not reasonably create an inference that Dorsey's failure to comply was accompanied by the mens rea necessary for a criminal contempt conviction.

 The circuit court in *Craft* based its holding of criminal contempt upon the defendant's failure to make support payments from June 1996 to February 1997. The Court agreed that Craft's income of $80 to $100 weekly during this period, with rent of $75 weekly, was insufficient for him to make support payments and that "he doesn't have the ability to pay civilly...." The court found Craft guilty of criminal contempt, however, on the theory that Craft could have obtained a better job despite the loss of his driver's license. The only "evidence" supporting this finding was the trial court's purported judicial notice that Craft could "probably make $240 a week working at one of the fast food places." There was no "evidence" relating to the employment opportunities at the fast food places, Craft's qualifications for a job at these establishments, the wages available at such places, the distance between Craft's residence and the fast food places, or the availability of public transportation.

Assuming *arguendo* that the unsworn statements by defense counsel and the agency representative should be treated as evidence, nevertheless such "evidence" was wholly insufficient to support an inference that Craft's failure to comply was accompanied by a contumacious intent.

*IN NO. 112, DORSEY v. STATE, THE JUDGMENT OF THE CIRCUIT COURT FOR CECIL COUNTY IS REVERSED, AND THE CASE IS REMANDED TO THAT COURT FOR THE ENTRY OF A VERDICT OF "NOT GUILTY." COSTS TO BE PAID BY CECIL COUNTY.*

*IN NO. 113, CRAFT v. STATE, THE JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED, AND THE CASE IS REMANDED TO THAT COURT WITH DIRECTIONS TO REVERSE THE JUDGMENT OF*

**356**

*THE CIRCUIT COURT FOR CECIL COUNTY AND TO REMAND THE CASE TO THE CIRCUIT COURT FOR ENTRY OF A VERDICT OF "NOT GUILTY." COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY CECIL COUNTY.*