972 A.2d 954

Stuart FISHER a/k/a Neil Fisher

v.

McCRARY CRESCENT CITY, LLC, et al.

No. 1282, Sept. Term, 2007.

Court of Special Appeals of Maryland.

June 8, 2009.

88

92

Steven D. Silverman & Richard Winelander (Erin Murphy, Silverman, Thompson, Slutkin & White, The Winelander Law Group, on the brief), Baltimore, for Appellant.

Richard Falcon (William H. Murphy, Jr., Kenneth B. Frank, The Murphy Firm, on the brief), Baltimore, for Appellee.

Panel: JAMES R. EYLER, WRIGHT, EMORY A. PLITT, JR., (Specially assigned), JJ.

JAMES R. EYLER, Judge.

This appeal arises from a judgment entered by the Circuit Court for Baltimore City against appellants, Edward V. Giannasca, II ("Giannasca"), Stuart Cornelius Fisher, a.k.a. "Neil Fisher" ("Stuart"), Tamara Jeanne Fisher ("Tamara"), TJ Biscayne Holdings, LLC ("TJB"), Giannasca Crescent City, LLC ("GCC"), Market Street Properties Palm Beach, LLC ("MS"), and Crescent City Estates, LLC ("CCE"), in favor of appellees, Michael C. McCrary ("McCrary"), McCrary Crescent City, LLC ("MCC"), MR Crescent City, LLC ("MRCC"), and CCE.[1] The following chart illustrates the status of the parties in this litigation:

| Plaintiffs (Appellees) | Defendants (Appellants) |
|---|---|
| McCrary | Giannasca |
| MCC | Stuart |

---

1. As is apparent from the chart, CCE is both an appellant and appellee.

| MRCC | Tamara |
|------|--------|
| CCE | GCC |
| | MS |
| | TJB |
| | CCE |

McCrary owns MCC. MCC owns MRCC. Giannasca and Stuart own GCC.[2] MRCC and GCC each owned a 50% interest in CCE. CCE owned the New Orleans building ("the building") that is at issue in this case. Tamara, Stuart's wife or ex-wife,[3] owns TJB. Stuart and Tamara jointly own MS.[4] The following chart illustrates the organization of the parties with respect to each other[5]:

**2.** Giannasca and Stuart each represented to McCrary that Stuart possessed an ownership interest in GCC or an ownership interest in CCE through GCC, although the documentation portrays Giannasca as the sole owner of GCC.

**3.** It is not clear whether Stuart and Tamara are divorced.

**4.** Tamara is the owner of record of MS. However, Stuart stated in his deposition that he and Tamara jointly own MS.

**5.** It may be helpful to think of McCrary, MCC, and MRCC as the McCrary entities; GCC as the Stuart Fisher and Giannasca entity; Tamara, TJB, and MS as the Tamara Fisher entities; and CCE as an entity owned one-half by the McCrary entities and one-half by GCC.

The circuit court, by "Second Revised Order and Judgment" dated September 16, 2008, entered the judgment after entering orders of default as to liability against Giannasca, Stuart, and Tamara because they violated court orders and committed discovery failures; entering judgment as to liability against TJB, MS, GCC, and CCE after they failed to answer the complaint; and sanctioning Giannasca, Stuart, Tamara, MS, and TJB by precluding them and their counsel from participating at the damages hearing because they violated court orders and committed discovery failures. The circuit court awarded approximately (1) $17.8 million in compensatory damages in favor of CCE against all appellants with the exception of CCE; (2) $15.8 in million punitive damages in favor of all appellees against all appellants with the exception of CCE; and, (3) $8.9 million in compensatory damages in favor of McCrary, MCC, and MRCC against CCE. The following chart illustrates the structure of the damages award:

| Compensatory | Punitive |
|---|---|
| McCrary, MCC, MRCC $8.9 Million | McCrary, MCC, MRCC, CCE $15.8 Million |
| CCE $17.8 Million | |
| Giannasca, Stuart, Tamara, GCC, TJB, MS | Giannasca, Stuart, Tamara, GCC, TJB, MS |

On appeal, appellants present several contentions, but we need only decide whether the circuit court erred when it denied Stuart's motion to dismiss, denied Tamara's motion to dismiss, entered orders of default and imposed sanctions, and awarded punitive damages and other remedies. We shall affirm the orders of default as to liability but we shall vacate

the judgment and remand for further proceedings because of errors relating to the assessment of damages.

## Background

Appellees claim that Giannasca, Stuart, and Tamara, acting individually and through their respective entities, fraudulently concealed certain insurance proceeds that should have been paid to CCE. CCE was owned one-half by the McCrary entities and one-half by Giannasca and Stuart through GCC. The operative complaint[6] is lengthy and contains detailed factual allegations. In circuit court, Giannasca and the Fishers disputed many of the facts, but the orders of default established the operative facts, giving rise to liability. We shall provide an overview at this point and include some additional information, as relevant, when we discuss the issues.

As previously mentioned, McCrary owns MCC, and MCC is the sole owner and member of MRCC (all three hereinafter "McCrary" except when necessary to distinguish them). In February 2005, Giannasca, who co-owned GCC with Stuart, approached McCrary about an investment opportunity. Giannasca asked McCrary to partner with him to buy a building in New Orleans, and convert it into "up-scale" residential condominiums.

McCrary agreed,[7] and MRCC and GCC formed CCE. CCE's operating agreement appointed Giannasca as manager. MRCC and GCC each held a 50% ownership in CCE. CCE purchased a building in New Orleans (the "building"). CCE also obtained property damage insurance on the building from Lexington Insurance Company ("LIC") and One Beacon Insurance Company ("OBIC").

---

**6.** The third amended complaint is the last and, therefore, the operative complaint.

**7.** McCrary's agents were involved in some of the subsequently mentioned communications.

In late August 2005, Hurricane Katrina struck New Orleans. Hurricane Katrina caused damage to the building's internal mechanical systems, and created several environmental hazards within the building. Accordingly, CCE filed insurance claims with LIC and OBIC, and retained a public insurance adjuster named Richard Agid to represent CCE in pursuing the insurance claims. McCrary was informed about the insurance claims, but was not informed about the substance of the claims or that Agid represented CCE.

In early October 2005, McCrary asked Giannasca and Stuart about the progress of the insurance claims. Stuart told Giannasca that an early meeting with the insurance companies had "gone well," but cautioned that "we will have to wait and see."

A few weeks later, LIC issued a check to CCE for $1 million, representing the first insurance payment. Neither Giannasca nor Fisher told McCrary that CCE received this payment. Instead, the next day, Giannasca paid $450,000 of the insurance proceeds to himself, $150,000 of the insurance proceeds to Stuart, and $150,000 of the insurance proceeds to TJB. TJB is a Florida entity owned and managed by Tamara.

In late October 2005, Giannasca hosted a conference call with Stuart and McCrary in his Baltimore City office. Giannasca and Stuart told McCrary that the insurance claims probably would be denied.

On November 9, 2005, CCE sold the building to an unrelated party. CCE used the sale proceeds to pay its debts, including a loan for $3.5 million that McCrary made to CCE. Ultimately, CCE made a profit of approximately $6.3 million off of the sale. Giannasca and Stuart told McCrary that they needed to use a substantial portion of the proceeds to pay CCE's outstanding operating expenses. Giannasca and Stuart told McCrary that the expenses totaled approximately $1.7 million, but never provided any proof of the expenses. After expenses, CCE was left with approximately $4.7 million. McCrary was paid approximately $2.35 million, in accordance with his 50% ownership interest in CCE.

Giannasca met with McCrary at Giannasca's Baltimore office in December 2005. Giannasca told McCrary that the insurance companies denied CCE's insurance claims, and that CCE would not receive any insurance proceeds.

Two months later, in February 2006, LIC paid CCE $2 million in additional insurance proceeds. Neither Giannasca nor Fisher told McCrary that CCE received this payment. Instead, Stuart paid approximately $1.72 million to himself.

In March 2006, LIC paid CCE $7 million in additional insurance proceeds. Neither Giannasca nor Fisher told McCrary that CCE received this payment. Instead, Stuart wired $700,000 to a private trust account, and paid $5 million to TJB. TJB invested the $5 million in another real estate investment project called the Entergy Project. MS is a member of an organization that is the owner and developer of the Entergy Project. Tamara and Stuart jointly own MS.

In April 2006, OBIC paid CCE $2 million in insurance proceeds. Neither Giannasca nor Fisher told McCrary that CCE received this payment. Instead, Stuart transferred $800,000 to Giannasca, $200,000 to Tamara, and $200,000 to himself.

McCrary, Giannasca, and Stuart all attended Tamara's birthday party in July 2006. Agid, the insurance adjuster, attended the party as well. McCrary met Agid at the party for the first time. Agid introduced himself to McCrary as the public insurance adjuster retained by CCE who "got the pot of gold for you guys." Surprised and confused, McCrary asked Agid for further details. Agid revealed that the insurance proceeds totaled $12 million. McCrary confronted Giannasca at the party, asking him "How much did we get from insurance?" McCrary asked the question four times. Giannasca responded "what?," "huh?," "what are you talking about?," and "I don't know." McCrary then asked Giannasca the question a fifth time. Giannasca replied "Two or three million.... Ask [Stuart]." After the party, McCrary contacted Giannasca and Stuart multiple times via email, and asked them to account for

the insurance proceeds. Giannasca and Stuart never complied.

Appellees filed suit on February 23, 2007, against appellants, with the exception of the Tamara Fisher entities, who were added at a later time. On August 24, 2007, appellees filed the third amended complaint. The gist of the action was fraudulent concealment of insurance proceeds, but it also contained counts alleging breach of contract, unjust enrichment, breach of fiduciary duty, violation of a Louisiana anti-fraud statute, conspiracy and aiding and abetting, and a derivative claim by MRCC and MCC on behalf of CCE. In addition to damages, appellees sought an accounting, injunctive relief, and the imposition of a trust on assets.

On July 2, 2007, the court entered a scheduling order, which established a discovery cutoff date of February 21, 2008 and a trial date of June 17, 2008.

Giannasca, GCC, TJB, and CCE never answered the complaint or subsequent complaints, or filed motions to dismiss. None of the appellants complied with temporary restraining orders ("TROs") issued by the court, which, in essence, prohibited the transfers of assets and required an accounting by specified dates. Giannasca, Tamara, and TJB were the only appellants who produced any requested documents during discovery, but the documents largely were irrelevant and did not fully comply with the discovery requests. Giannasca never appeared for his deposition. Stuart left his deposition before it was finished and without notifying anyone, then failed to appear for the completion of his deposition on at least one subsequent occasion. Tamara failed to appear for her properly scheduled deposition on at least three occasions. When Tamara finally appeared for her deposition, she testified that she had no knowledge of nearly all the facts in this case, including information relating to her own finances. Appellants delayed the litigation for over six months by filing an unauthorized petition for bankruptcy, which the federal bankruptcy court eventually dismissed.

The circuit court entered orders of default as to liability against Giannasca, Stuart, Tamara, MS, TJB, GCC, and CCE because of failure to plead or as sanctions because of violations of court orders or failure of discovery. The circuit court also sanctioned Giannasca, Stuart, Tamara, MS, and TJB for their discovery failures and violations of court orders by precluding them from participating at the damages hearing. Following the damages hearing, the court entered a judgment, awarding approximately $17.8 million in compensatory damages to CCE against Giannasca, Stuart, Tamara, MS, TJB, and GCC. The court also awarded approximately $8.9 million in compensatory damages to McCrary, MCC, and MRCC against CCE.[8] Additionally, the court awarded approximately $15.8 million in punitive damages to McCrary, CCE, MRCC, and MCC against Giannasca, Stuart, Tamara, MS, TJB, and GCC jointly and severally. Furthermore, the circuit court removed Giannasca from his position as manager of CCE, enjoined Giannasca and Stuart from taking any action on behalf of CCE, established a constructive trust to hold appellants' funds directly or indirectly derived from funds or assets of CCE, and ordered Giannasca, Stuart, Tamara, MS, TJB, and GCC to "disgorge" all revenues and profits acquired with the funds or assets of CCE. This appeal followed.

### Questions Presented

Appellants present the following questions:

I. Did the trial court err in denying [Stuart's] motion to dismiss the complaint?

II. Did the trial court err in denying [Tamara and MS's] motion to dismiss the complaint?

III. Did the trial court deprive [Tamara, TJB, and MS] of procedural due process when it granted default judgments against them on an accelerated basis?

IV. Did the trial court err in precluding appellants and their counsel from participating in the damages hearing?

---

8. Presumably, this award reflected MRCC's one-half interest in CCE.

V. Did the preclusion of appellants' counsel from participation in the damages phase of the trial deprive appellants of due process of law?

VI. Did the trial court err in awarding compensatory damages?

VII. Did the trial court err in awarding punitive damages?

VIII. Did the trial court err in awarding pre-judgment interest?

In light of our disposition of appellants' other questions, we need not address appellants' sixth contention—where appellant contends that the circuit court improperly admitted certain evidence during the damages proceeding and that the evidence was legally insufficient in any event—nor appellants' eighth contention—where appellant contends that the circuit court erred when awarding prejudgment interest.[9] To ease our analysis, we combined, re-worded, and re-ordered the remaining questions as follows:

I. Did the circuit court err when it denied Stuart's motion to dismiss?

II. Did the circuit court err when it denied Tamara and MS's motion to dismiss?

III. Did the circuit court err when it entered orders of default as to liability and imposed sanctions against appellees?

IV. Did the circuit court err when it awarded punitive damages and imposed other remedies?

## Discussion

### I. *Stuart's Motion to Dismiss*

Stuart argues that the circuit court erred when it denied his motion to dismiss because he was improperly served, the circuit court lacked personal jurisdiction over him, Maryland was an improper forum, and the circuit court was an improper

---

**9.** Appellants' counsel will be able to participate in the damages hearing on remand and note any proper objections.

venue. As appellants acknowledge, these issues are of law, even though at the time they were decided, they were decided on affidavits. *See Bond v. Messerman,* 391 Md. 706, 718, 895 A.2d 990 (2006).

## A. *Service*

 Stuart, a resident of Florida, argues that he was improperly served because appellees tricked him into coming to Maryland, and then served him. In Maryland,

> [i]f a defendant is within the jurisdiction of the Court by means of fraud or trickery of the plaintiff, no act accomplished thereby can be allowed to stand. There is very little difference between enticing a person from one jurisdiction to another for the purpose of getting process on him and by carrying him by force from one jurisdiction to another to be served with process. A fraud or trick usually has a fair face. It would not succeed without it.

*Margos v. Moroudas,* 184 Md. 362, 371, 40 A.2d 816 (1945). Appellants cite two cases discussed by the *Margos* Court: *Commercial Mutual Accident Co. v. Davis,* 213 U.S. 245, 29 S.Ct. 445, 53 L.Ed. 782 (1909), and *Empire Manufacturing Co. v. Ginsburg,* 253 Ill.App. 242 (1929).

In *Commercial Mutual,* the plaintiff's husband died from a gunshot wound. 213 U.S. at 250, 29 S.Ct. 445. The insurance company asked to inspect the decedent's body. *Id.* The plaintiff invited the insurance company to send an examiner, and asked that the examiner have authority to settle the matter if appropriate. *Id.* at 250–51, 29 S.Ct. 445. The company sent a doctor, and authorized him to settle the matter if appropriate. *Id.* at 251, 29 S.Ct. 445. Upon arrival, the insurance company's doctor asked the plaintiff to procure an additional doctor to oversee his examination. *Id.* At that point, the plaintiff served the doctor. *Id.* The insurance company challenged the service. *Id.* at 251–52, 29 S.Ct. 445. The Supreme Court held that the plaintiff did not trick the insurance company into service, explaining that "[t]here is testimony tending to show that both parties expected an

adjustment of the claim to be made at this meeting, which was held for that purpose." *Id.* at 257, 29 S.Ct. 445.

In *Empire Manufacturing*, the plaintiff invited the defendant to the forum state "to settle the controversy." 253 Ill.App. at 244. The plaintiff arrived in the forum state on a train. *Id.* A representative of the defendant met the plaintiff at the train station. *Id.* The defendant's representative informed the plaintiff that he had a car that would take the plaintiff to the meeting. *Id.* The plaintiff entered the back seat of the car, where a deputy sheriff immediately served him. *Id.* The court held that the service was improper because the plaintiff tricked the defendant into entering the forum state. *Id.* at 247.

The difference between these cases is that in *Empire Manufacturing*, the plaintiff promised to conduct settlement negotiations, only to lure the defendant to the forum and serve the defendant without ever making a bona fide attempt to settle. *Id.* at 247. In *Commercial Mutual*, the plaintiff and the defendant made a good faith bona fide effort to settle. 213 U.S. at 256–57, 29 S.Ct. 445. The plaintiff served the defendant only after negotiations broke down. *Id.* at 257, 29 S.Ct. 445.

■ In this case, there is evidence that Stuart came to Maryland intending to settle the case. On August 8, 2006, Stuart, who supposedly possesses a law degree, emailed McCrary and stated [10]:

You, [Giannasca], and I have to meet face to face to resolve all issues. I believe that this is possible. I have always been willing to do that. . . . Let me know what your schedule is and perhaps all of us can meet over the weekend. Because both you and [Giannasca] are in Baltimore it only make[s] sense for me to come see both of you.

On February 12, 2007, Stuart emailed McCrary, stating, "Perhaps if your [sic] guys schedule works, I can drive up to

---

**10.** Stuart's emails are in all capital letters. When quoting Stuart's emails, we will use upper and lower case letters.

Baltimore and we can meet on Monday March 5, in the afternoon or for dinner. Let me know."

Stuart stated on several occasions that the purpose of the February 23, 2007 meeting was to settle the issues underlying this case. For example, at the hearing on the motion to dismiss, the following colloquy occurred:

> THE COURT: And there was an email that suggested that [Stuart] was the one that proposed coming to Maryland. [STUART'S COUNSEL]: There's no question about that, Your Honor. [Stuart] recognized the need to sit down with ... McCrary and have a meeting. He said, "I'll come to Baltimore if that's more convenient for you," to have a settlement meeting.[ ] He didn't say I'll come to Baltimore so you can serve me with process and a lawsuit that I don't know anything about. That's not what he would have done

* * *

> The misapprehension was he thought he was coming for a settlement meeting. When he was introduced to [McCrary's attorney], he was not told that [McCrary's attorney] was outside counsel for ... McCrary.

Additionally, in Stuart's "Second Affidavit," Stuart stated, "The settlement meeting that occurred on February 23, 2007, had its origins in a birthday party . . . ."

The evidence also indicates that McCrary intended to and did make a good faith effort to settle the case at the meeting. McCrary, Giannasca, and Stuart met in Maryland on February 23, 2007, at around 10 a.m. The group[11] discussed settling this case for approximately four hours, and apparently were close to settling the case on several occasions.[12]

---

11. McCrary's attorney also was present at the meeting, and participated in negotiations. Stuart did not object to the presence of McCrary's attorney, and continued with the meeting. There is a dispute as to whether Stuart was told that McCrary's attorney was a practicing or nonpracticing attorney.

12. Giannasca left the meeting around 12:30 p.m. to tend to other matters.

McCrary served Stuart only after the negotiations broke down.

Under *Margos* and *Commercial Mutual* the circuit court did not err in its ruling because the evidence supports a conclusion that Stuart willingly came to Maryland, both Stuart and McCrary intended to settle and made a good faith attempt to settle the claim at the meeting, and service occurred only after the bona fide settlement negotiations broke down.

## B. *Personal Jurisdiction*

Stuart argues that the circuit court erred when it denied his motion to dismiss because the circuit court lacked personal jurisdiction over him.

A circuit court has personal jurisdiction over a nonresident defendant if the requirements of the Maryland long-arm statute, Maryland Code (2006 Repl.Vol.), § 6–103 of the Courts and Judicial Proceedings Article, have been satisfied and exercising jurisdiction comports with due process i.e., defendant has minimum contacts with the forum, such that the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice. *See Himes Associates, Ltd. v. Anderson,* 178 Md.App. 504, 527, 943 A.2d 30 (2008). Appellants do not challenge the applicability of the statute, but assert that the exercise of jurisdiction violated due process.

Under the conspiracy theory of personal jurisdiction, a defendant possesses the requisite minimum contacts if the defendant (1) entered into a conspiracy, and (2) "had a reasonable expectation, at the time the co-conspirator agreed to participate in the conspiracy, that acts to be done in furtherance of the conspiracy by another co-conspirator would be sufficient to subject that other co-conspirator to personal jurisdiction in the forum." *Mackey v. Compass Mktg., Inc.,* 391 Md. 117, 132–34, 892 A.2d 479 (2006).

Appellees pled conspiracy, and the circuit court entered an order of default, establishing that Stuart engaged in a conspiracy. Nevertheless, Stuart argues that he could not

have reasonably expected that acts would be done in further-ance of the conspiracy sufficient to subject him to personal jurisdiction in Maryland. We disagree.

Before entering into the conspiracy, Stuart knew that his co-conspirator, Giannasca, was a Maryland resident and main-tained an office in Maryland. Furthermore, Stuart knew that McCrary maintained an office in Maryland, and had other Maryland ties. Stuart also knew that Giannasca was the manager of CCE, and CCE's operating agreement required Giannasca to deposit all CCE funds in a Maryland bank account. Any reasonable person with knowledge of these facts would have reasonably expected that acts would be done in furtherance of the conspiracy sufficient to subject him to personal jurisdiction in Maryland.

## C. *Forum Non Conveniens*

Stuart argues that Maryland was not the appropriate forum for this case. As appellants acknowledge, the circuit court is vested with wide discretion when determining whether a forum is convenient. *See, e.g., Johnson v. G.D. Searle & Co.,* 314 Md. 521, 523, 526, 552 A.2d 29 (1989).

Maryland is not an inconvenient forum for the parties. Giannasca and McCrary are Maryland residents. Giannasca, CCE, and McCrary all maintained offices in Maryland, provid-ing easy access to sources of proofs. Although Stuart and Tamara are nonresidents, Stuart has a history of doing busi-ness in Maryland. Moreover, Giannasca and Stuart carried out fraudulent activities in Maryland when they made fraudu-lent misrepresentations to appellees. There is nothing to indicate that obtaining compulsory process for unwilling wit-nesses would be difficult, or that the cost of obtaining the attendance of witnesses would be prohibitive. Viewing the premises at issue is not important.

Appellants argue that Florida and Louisiana were conve-nient forums for this case. Stuart, Tamara, TJB, and MS all are Florida residents. GCC and CCE are Louisiana resi-dents. The building at issue is located in Louisiana. More-

over, fraudulent acts occurred in both Florida and Louisiana. Nevertheless, the convenience of Florida and Louisiana does not preclude Maryland from also being a convenient forum.

### D. *Improper Venue*

Stuart also argues that "[t]he action did not belong in the Circuit Court for Baltimore City. None of the parties on either side had actual physical addresses in Baltimore City that would have made venue proper."

Maryland Code (2006 Repl.Vol.), § 6–201(a) of the Courts and Judicial Proceedings Article provides "a civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation. In addition, a corporation also may be sued where it maintains its principal offices in the State." Furthermore, a plaintiff can bring suit in any county in the State in an action for damages against a nonresident individual. *Id.* §§ 6–201(a), –202(11). If the action is against a corporation that has no principal place of business in Maryland, the appropriate venue is the county where the plaintiff resides. *Id.* § 6–202(3).

██ Venue is proper anywhere in Maryland against Stuart and Tamara because they are nonresident individuals. Venue is proper in Baltimore County against GCC, MS, and TJB because they are nonresident corporations with no principal place of business, and one of the plaintiffs, McCrary, resides in Baltimore County. Although CCE also is a nonresident defendant, CCE's principal place of business was in Baltimore City because its only office was in Baltimore City. Giannasca resided in Harford County, and carried on regular business in Baltimore City because he was the sole manager of CCE, and CCE's only office was in Baltimore City. Therefore, no single venue was appropriate for all defendants.

"If there is more than one defendant, and there is no single venue applicable to all defendants, under [§ 6–201(a)], all may be sued in a county in which any one of them could be sued, or in the county where the cause of action arose." *Id.*

R. 6–201(b). Under this rule, the Circuit Court for Baltimore City was an appropriate venue.

## II. *Tamara and MS's Motion to Dismiss* [13]

■ Appellees asserted personal jurisdiction over Tamara and MS under a conspiracy theory. As we previously stated, under the conspiracy theory of personal jurisdiction, Maryland courts have personal jurisdiction over a conspirator when the conspirator (1) entered into a conspiracy; and (2) "had a reasonable expectation, at the time the coconspirator agreed to participate in the conspiracy, that acts to be done in furtherance of the conspiracy by another co-conspirator would be sufficient to subject that other coconspirator to personal jurisdiction in the forum." *Mackey*, 391 Md. at 132–134, 892 A.2d 479.

### A. *Tamara and MS Entered Into the Conspiracy*

The complaint alleged facts sufficient to establish that Tamara knowingly participated in a conspiracy. Specifically, the complaint alleged that Tamara is or was Stuart's wife, a member of MS, and a member and the manager of TJB. LIC Paid $1 million to CCE in October 2005. CCE paid $150,000 of the proceeds to TJB. Tamara managed TJB. LIC also paid CCE $5 million to CCE in insurance proceeds on March 22, 2006. Eight days later CCE paid $5 million to TJB. On April 6, 2006, TJB transferred $4.2 million to Tamara's per-

---

**13.** Despite the fact that TJB failed to raise the issue below, TJB argues that we also should examine whether the court had personal jurisdiction over TJB. TJB argues that it was unable to raise the issue below because the circuit court prohibited it from defending itself. This argument does not hold water. The circuit court granted partial summary judgment, on liability, against TJB, at the trial on June 25, 2008. Prior to that, on June 23, the circuit court granted discovery sanctions against TJB. The circuit court never "prohibited [TJB] from defending itself" in any other phase of the litigation. TJB never filed an answer or a motion to dismiss. TJB could have asserted the jurisdictional argument in a motion to dismiss, or at a subsequent point in the litigation. TJB failed to do so, and thus, we refuse to address its jurisdictional argument. Nevertheless, we note that TJB's jurisdictional argument is meritless for the same reasons that Tamara and MS's personal jurisdiction argument does not prevail.

sonal account. OBIC also paid CCE $2 million. Subsequently CCE transferred $200,000 to Tamara. Furthermore, MS is a member of the owner and developer of the Entergy Project, where other portions of the insurance proceeds were invested. It is reasonable to infer that Tamara knew the origin of the substantial funds that were deposited into her personal account and TJB's account, and were invested in MS's development projects. The cases relied on by appellants, *McKown v. Criser's Sales and Service*, 48 Md.App. 739, 430 A.2d 91 (1981), and *AP Links, LLC v. Global Golf, Inc.*, Civ. Action No. CCB–08–705, 2008 WL 4225764 (D.Md. Sept.2, 2008), are not apposite because they involved a failure of proof. The existence of the conspiracy in this case was established by the orders of default as to liability. The conspiracy, as thus established, existed prior to the initiation of this action.

B. *Tamara and MS had Reason to Believe that They Would Be Subject to Personal Jurisdiction in Maryland*

Appellees alleged in their complaint that Tamara, and consequently MS, knew at the time that they conspired to defraud appellees that Giannasca lived in and maintained his principal office in Maryland. Tamara knew that McCrary was from Maryland and maintained an office in Maryland. Any reasonable person would have reason to believe that they would be subject to personal jurisdiction in Maryland when they conspire with a Maryland resident with its primary office in Maryland against another individual with personal ties to Maryland and their principal place of business in Maryland. Despite knowing that the conspiracy involved actors with ties to Maryland, neither Tamara nor MS refrained from entering into the conspiracy. In fact, Tamara and MS continued to participate in the conspiracy despite the fact that numerous acts in furtherance of the conspiracy occurred in Maryland.[14]

---

14. For example, in October 2005 in Giannasca's Maryland office, Giannasca told McCrary's representative that the insurance companies would deny their claims. In December 2005 in Giannasca's Marland office, Giannasca told McCrary that the insurance companies denied their claims, and CCE would not receive any insurance proceeds. In

Again, appellants' reliance on cases, such as *Capital Source Finance, LLC v. Delco Oil Inc.*, Civ. Action No. DKC 2006–2706, 2007 WL 3119775 (D.Md. Sept.17, 2007), is unavailing because they were based on lack of sufficient allegations. In this case, there were detailed allegations and an order of default as to liability.[15]

III. *Orders of Default, Contempt, and Discovery Sanctions*

In some instances, when finding appellants in contempt and imposing discovery sanctions, the circuit court erred because it failed to follow the proper procedures. In addition, it abused its discretion when it precluded certain appellants and their counsel from participating in the damages hearing.

A. *Procedural Flaws*

When a party or circuit court is confronted with an uncooperative party, the party or circuit court may seek to compel the party's cooperation, or punish the party. Specifically, the party or circuit court may pursue direct civil or criminal contempt sanctions, constructive civil or criminal contempt sanctions, or discovery sanctions. The remedies may overlap, but each one has certain requirements, largely contained in the applicable rules, which must be followed. Because the court may wish to revisit the question of sanctions on remand, we shall summarize the major requirements for each remedy.[16] *See infra* Parts III.A.1–4. We then will apply the rules to the facts of this case. *See infra* Part III.A.5.

---

January 2006, in Giannasca's Maryland office, Giannasca executed and transmitted a "Release and Indemnity Agreement" to induce LIC to pay additional insurance proceeds.

**15.** Appellants argue that they were subject to personal jurisdiction in Florida and Louisiana. Assuming that to be true, it is not relevant to our examination of Maryland's personal jurisdiction.

**16.** We shall not discuss any rules specifically relating to contempt actions for spousal or child support.

 Contempt proceedings require an action constituting contempt.

> In a narrow sense, a contempt has been defined as a despising of the authority, justice, or dignity of the court; in a more general sense, a person whose conduct tends to bring the authority and administration of the law into disrespect or disregard, interferes with or prejudices parties or their witnesses during litigation, or otherwise tends to impede, embarrass, or obstruct the court in the discharge of its duties, has committed a contempt.

*Goldsborough v. State,* 12 Md.App. 346, 355, 278 A.2d 623 (1971).

 If a contempt has occurred, the moving party and the court must determine the nature of the contempt proceeding—i.e., direct or constructive, and civil or criminal. *See State v. Roll and Scholl,* 267 Md. 714, 298 A.2d 867 (1973) (holding that the nature of the contempt proceeding is determined before reaching the time for imposing sanctions). To conduct this analysis, parties and courts first should determine whether the contempt was direct. *See infra* Part III.A.1. If the contempt was direct, the party or court follows the same rules to dispose of the case, regardless of whether the contempt was criminal or civil. *See infra* Part III.A.1. If the contempt was not direct, it must have been constructive. Md. Rule 15–202(a). The party or court then must determine whether the constructive contempt was criminal or civil, and apply the rules accordingly. *See infra* Parts III.A.2–3.

A court may impose discovery sanctions if "a failure of discovery" has occurred or if a party has failed to obey an order compelling discovery. Md. Rule 2–433(a), (c); *see infra* Part III.A.4.

### 1. Direct Civil and Criminal Contempt

 A direct contempt is "a contempt committed in the presence of the judge presiding in court or so near to the judge as to interrupt the court's proceedings." Md. Rule 15–202(b). Direct contempt proceedings are inappropriate when

the judge does not have personal knowledge of all relevant facts, and must learn all of the facts from others. *Roll and Scholl*, 267 Md. at 734, 298 A.2d 867. Any contempt that is not a direct contempt—"where the judge must look at extrinsic evidence to determine that a contempt has been committed"—is a constructive contempt. Md. Rule 15–202(a); *Scott v. State*, 110 Md.App. 464, 480–81, 677 A.2d 1078 (1996); *see infra* Parts III.A.2–3.

Once the court finds that a direct contempt—either civil or criminal—has occurred, the court must determine whether to impose summary sanctions,[17] defer imposing sanctions until the conclusion of the proceeding where the alleged contemnor committed the contempt, or issue the sanctions after holding a hearing. We shall briefly discuss these three options.

First, summary sanctions are appropriate when the court observes actions that "pose[ ] an open, serious threat to orderly procedure that instant. . . ." *Roll and Scholl* 267 Md. at 733, 298 A.2d 867; *see also* Md. Rule 15–203(a). Ordinarily, the court should "afford the alleged contemnor an opportunity, consistent with the circumstances . . ., to present exculpatory or mitigating information." Md. Rule 15–203(a). The alleged contemnor may offer affidavits before or after the court imposes sanctions. *Id.* R. 15–203(c).

If the court issues sanctions summarily, the court must (1) issue a written order[18] (2) stating that a direct contempt has been committed; (3) specifying whether the contempt is civil or criminal[19]; (4) specifying the evidentiary

---

17. A court institutes summary sanctions when it does not conduct a hearing, and simply announces and imposes the sanctions. Md. Rule 15–203 advisory committee note.

18. Written orders with findings are mandatory. *Thomas v. State*, 99 Md.App. 47, 54–56, 635 A.2d 71 (1994).

19. For guidance in determining whether a contempt is civil or criminal, see *infra* Parts III.A.2–3. The principles used to determine whether a

facts that support a finding of direct contempt, known to the court from the court's own personal knowledge; (5) specifying the evidentiary facts that support a finding of direct contempt but are not known to the court's personal knowledge, and the court's basis of finding them as facts; (6) the sanction imposed for the contempt[20]; (7) how the contempt may be purged if the contempt is civil; (8) if the sanction is incarceration and the contempt is criminal, the determinate term of the incarceration; and (9) any condition under which the sanction may be suspended, modified, revoked, or terminated if the contempt is criminal. Md. Rule 15–203(b).

■■■■ Second, if the court wants to impose sanctions at the conclusion of the proceeding in which the contempt occurred, the court must "summarily find[ ] and announce[ ] on the record" after the contempt that the alleged contemnor committed direct contempt. Md. Rule 15–203(a). When the court issues sanctions at the conclusion of the proceeding, it should follow the same procedures used when issuing sanctions summarily immediately after the contempt. *See supra.*

Third, if the court wants to hold a hearing before issuing sanctions, "reasonably promptly" after the contemptuous conduct, the court must issue a written order identifying the contemnor, and the "evidentiary facts within the personal knowledge of the judge as to the conduct constituting the contempt." Md. Rule 15–204; *see also Hermina v. Baltimore Life Ins. Co.,* 128 Md.App. 568, 584–590, 739 A.2d 893 (1999) (holding that the court committed procedural errors when not summarily sanctioning a contemnor in a direct contempt case). The order should specify whether the contempt is civil or

---

constructive contempt is civil or criminal are the same principles used to determine whether a direct contempt is civil or criminal.

**20.** Reciting the facts is more than a formality; it is essential to disclosing the basis of a contempt decision with sufficient particularity, such that an appellate court can conduct an informed review of the legal sufficiency. *Robinson,* 19 Md.App. at 25–26, 308 A.2d 712. Indeed, conclusory language and general citations are not sufficient. *Id.* at 26, 308 A.2d 712.

criminal. *See* Md. Rule 15–204; *infra* Parts III.A.2–3. If the contempt is civil, the court must proceed pursuant to the constructive civil contempt rules. Md. Rule 15–204; *see infra* Part III.A.2. If the contempt is criminal, the court must proceed pursuant to the constructive criminal contempt rules. Md. Rule 15–204; *see infra* Part III.A.3.

With certain exceptions, the judge instituting the direct contempt proceeding is disqualified from presiding over the hearing if the judge reasonably expects to be called as a witness at any hearing on the matter. Md. Rule 15–207(b).

Regardless of whether the court imposed the sanctions summarily, after the conclusion of the proceeding, or following a separate hearing, the clerk should ensure that the record consists of (1) the written order of contempt; (2) a transcript of the portion of the proceeding in which the court found someone in direct contempt, if the proceeding was recorded; and (3) "any affidavits offered or evidence admitted in the proceeding." *Id.* R. 15–203(d). The record should be composed so that the appellate court can conduct a meaningful review.

## 2. Constructive Civil Contempt

A party, the Attorney General,[21] or the court may institute a constructive civil contempt proceeding when (1) the movant intends to file or filed the proceeding as a continuation of the original action, as opposed to a separate and independent action; (2) the movant seeks relief to benefit themselves or a party instead of punishing the alleged contemnor; (3) "the acts complained of do not of themselves constitute crimes or conduct by the defendant so wilful or contumacious that the court is impelled to act on its own motion"; and (4) the contempt is not a direct contempt. Md. Rule 15–206(a), (b); *Winter v. Crowley,* 245 Md. 313, 317, 226 A.2d 304 (1967).

---

**21.** The court must request the Attorney General to institute the proceeding. Md. Rule 15–206(b)(2).

The court order or petition must satisfy three general requirements. The order or petition must comply with Rule 2–303 (form of pleadings), Md. Rule 15–206(c), and the order or petition must "expressly state whether or not incarceration is sought." *Id.* If the court initiates the proceeding or receives a petition for constructive civil contempt, the court must "enter an order," generally referred to as a show cause order, as long as the petition for contempt is not "frivolous on its face . . . ." *Id.* R. 15–206(c)(2).

The show cause order must include three elements. First, if incarceration is sought, the court must provide a notice in the form set forth in Rule 15–206(c)(2)(C). Second, the order must establish a date by which the alleged contemnor must answer the petition. *Id.* R. 15–206(c)(2)(A). The date may not be less than 10 days after service of the order, unless good cause exists. *Id.* Third, the order must establish a time and place at which the alleged contemnor must appear in person for a prehearing conference, a hearing, or both. *Id.* R. 15–206(c)(2)(B). If the court schedules a hearing, the order also must state whether the hearing is before a master or a judge.[22] *Id.* With certain exceptions, if the judge initiated the proceeding, the hearing cannot be before that judge if the judge reasonably expects to be called as a witness. *Id.* R. 15–207(b). Additionally, if the court schedules a hearing, the hearing date must allow the alleged contemnor a reasonable amount of time to prepare a defense. *Id.* R. 15–206(c)(2). The amount of time may not be less than 20 days after the prehearing conference. *Id.* Also, when scheduling the hearing, the court may consolidate constructive criminal and civil contempt petitions for hearing and disposition. Md. Rule 15–207(a). Nevertheless, the constructive criminal and civil contempt proceedings must have separate charging documents. *Dorsey v. State,* 356 Md. 324, 348–50, 739 A.2d 41 (1999).

The Rules' requirement of an answer and a hearing for the alleged contemnor in a constructive civil contempt

---

**22.** If a master, Rule 9–208(a)(*l*)(G) applies.

proceeding is one of the main differences between constructive and direct proceedings. The court may punish contempt summarily only in direct contempt proceedings. *Betz v. State,* 99 Md.App. 60, 66, 635 A.2d 77 (1994). In contrast, in constructive contempt proceedings, the court must give the accused contemnor an opportunity to challenge the alleged contempt and show cause why a finding of contempt should not be entered. *Id.*

The show cause order must be served upon the alleged contemnor pursuant to Rule 2–121 (service of process-in personam) or in the manner prescribed by the court if the alleged contemnor is a party in the action.

If the hearing on constructive civil contempt is before a master, Rule 9–208 (referral of matters to masters) is applicable. If the hearing on constructive civil contempt is before a judge, the alleged contemnor appears without counsel, and incarceration is sought, the court must follow a specific set of procedures. *See id.* R. 15–206(e)(*l* ), (2) (notice and right to and waiver of counsel).

If the hearing on constructive civil contempt is before a judge, incarceration is sought, and the alleged contemnor asks to discharge his counsel, the court must follow another specific set of procedures. *See id.* R. 15–206(e)(3) (meritorious reason).

If the alleged contemnor fails to appear at the hearing on constructive civil contempt, the court may (1) proceed ex parte; and/or (2) order the "sheriff or other peace officer to take custody of and bring the alleged contemnor before the court or judge designated in the order." *Id.* R. 15–207(c)(2). The rules do not allow for pre-hearing incarceration of the alleged contemnor. *Young v. Fauth,* 158 Md.App. 105, 110–12, 854 A.2d 293 (2004); *Redden v. Dep't of Soc. Servs.,* 139 Md.App. 66, 72–76, 773 A.2d 1094 (2001).

At the show cause hearing, the court may terminate the civil contempt proceeding and institute new criminal contempt proceedings if facts exist indicating "that the alleged contemnor cannot comply with the order of the court" due to

the contemnor's "deliberate effort or a wilful act of commission or omission ... committed with the knowledge that it would frustrate the order of the court. ..." *Roll and Scholl,* 267 Md. at 730, 298 A.2d 867. Nevertheless, some time lag must exist between the termination of the civil contempt proceeding and the trial of a new constructive criminal contempt case. Indeed, courts may not convert or merge a civil contempt proceeding to a criminal contempt proceeding midtrial. *Bryant v. Howard County Dep't of Soc. Servs.,* 387 Md. 30, 50, 874 A.2d 457 (2005); *Dorsey,* 356 Md. at 350–51, 739 A.2d 41.

A court must find civil contempt by a preponderance of the evidence. *Roll and Scholl,* 267 Md. at 728, 298 A.2d 867. Following a finding of contempt, the court must issue a written order specifying (1) the coercive sanction imposed for the contempt, and (2) how the contempt may be purged. Md. Rule 15–207(d)(2); *Roll and Scholl,* 267 Md. at 730, 298 A.2d 867 (stating that "[i]f it is a civil contempt the sanction is coercive and must allow for purging. ...."). The purging provision—another critical difference between civil and criminal contempt—is important. "In this way, a civil contemnor is said to have the keys to the prison in his own pocket." *Jones v. State,* 351 Md. 264, 281, 718 A.2d 222 (1998). Absent a purging provision, the sanction is no longer coercive and remedial. *See id.* at 279–83, 718 A.2d 222. Rather, the sanction is punitive, and "the constitutional and procedural rules applied to criminal trials must be observed." *Id.* at 280, 718 A.2d 222 (quotations and citations omitted).

Not only must a sanction contain a purge provision, but the contemnor must have the ability to comply with the purge provision. *Jones,* 351 Md. at 281–82, 718 A.2d 222. In other words, completion of the purging provision must be feasible. *See Young,* 158 Md.App. at 113–14, 854 A.2d 293; *Redden,* 139 Md.App. at 77–78, 773 A.2d 1094.

### 3. Constructive Criminal Contempt

The court, the State's Attorney, the Attorney General, or the State Prosecutor, depending on the circumstances, may

institute a constructive criminal contempt proceeding when (1) the movant intends to file or filed the proceeding as a separate action as opposed to a continuation of the original action; (2) the alleged contemnor willfully violated or attempted to frustrate a court order, such that the alleged contemnor offended the dignity or process of the court; (3) the act was not a direct contempt; and (4) the movant seeks to punish the alleged contemnor for his act. *See* Md. Rule 15–202(a), –205(a), (b); *Bryant,* 387 Md. at 47, 874 A.2d 457; *Dodson v. Dodson,* 380 Md. 438, 452, 845 A.2d 1194 (2004); *Roll and Scholl,* 267 Md. at 728, 298 A.2d 867.

The order or petition instituting the proceeding must contain the information required by Rule 4–202 (contents of charging document). Md. Rule 15–205(d). The order, along with a summons or warrant, must be served in accordance with Rule 4–212 (service of summons or warrant).

At the hearing on constructive criminal contempt,

> [w]hile a contemnor in a criminal contempt proceeding in Maryland is not entitled to indictment by a grand jury and may not have a right to a jury trial, .... [t]he burden of proof is increased [to proof beyond a reasonable doubt], the accused cannot be compelled to testify against himself, he cannot be put in double jeopardy, and, except when a contempt may be dealt with summarily, the panoply of fundamental due process rights comes into play.
>
> * * *
>
> These include not only the right to notice, and the opportunity to be heard but also the right to counsel and with the possibility of imprisonment an indigent has the right to have an attorney appointed for him.

*Roll and Scholl,* 267 Md. at 730–31, & 731 n. 12, 298 A.2d 867 (citations omitted).

With certain exceptions, the judge cannot be the same judge who (1) instituted the constructive criminal contempt proceeding; and (2) reasonably expects to be called as a witness at

any hearing on the constructive criminal contempt proceeding. Md. Rule 15–207(b).

If the alleged contemnor fails to appear at the hearing on constructive criminal contempt, the court may order the "sheriff or other peace officer to take custody of and bring the alleged contemnor before the court or judge designated in the order." *Id.* R. 15–207(c)(2). Unlike constructive civil contempt proceedings, the court may not conduct an ex parte proceeding. *See id.*

At the hearing, the State must prove beyond a reasonable doubt "a deliberate effort or a willful act of commission or omission by the alleged contemnor committed with the knowledge that it would frustrate the order of the court. . . ." *In re Ann M.,* 309 Md. 564, 569, 525 A.2d 1054 (1987). "[E]vidence of an ability to comply, or evidence of a defendant's conduct purposefully rendering himself unable to comply, may, depending on the circumstances, give rise to a legitimate inference that the defendant acted with the requisite willfulness and knowledge." *Dorsey and Craft,* 356 Md. at 352, 739 A.2d 41.

Following a finding of criminal contempt beyond a reasonable doubt, the court must issue a written order specifying a sanction. Md. Rule 15–207(d)(2). Unlike orders in constructive criminal contempt proceedings, orders in criminal contempt proceedings do not need a purge provision. *See id.* In constructive criminal contempt proceedings, sanctions punish the contemnor "for past misconduct which may not necessarily be capable of remedy." *Roll and Scholl,* 267 Md. at 728, 298 A.2d 867. In any event, "if the sanction is incarceration, the order [must] specify a determinate term[,] and any condition under which the sanction may be suspended, modified, revoked, or terminated." Md. Rule 15–207(d)(2). Ultimately, the sanction for criminal contempt "is largely within the discretion of the court, so long as it is not cruel or unusual." *Arrington v. Dep't of Human Res.,* 402 Md. 79, 100, 935 A.2d 432 (2007).

#### 4. Discovery Sanctions

Discovery sanctions are permitted if a "failure of discovery" has occurred or a party fails to obey an order compelling discovery. Md. Rule 2–432, –433. We reviewed the procedures in *Hossainkhail v. Gebrehiwot*, but will briefly summarize them herein. 143 Md.App. 716, 729–33, 795 A.2d 816 (2002).

A discovering party may move for sanctions without first moving to compel if another party fails to appear for a properly noted deposition, fails to respond to interrogatories, or fails to respond to a request for production or inspection. Md. Rule 2–432(a). When defending the motion for sanctions, the party against whom sanctions are sought may not argue that the court should excuse that party's discovery failure because the discovery sought is objectionable unless a protective order has been obtained. *Id.* R. 2–432(a).

A discovering party may move for an order compelling discovery if there is a failure of discovery or if a party provides discovery but fails to respond to one or more discovery requests, as enunciated in Md. Rule 2–432(b). "If the court denies the motion [to compel] in whole or in part, it may enter any protective order it could have entered on a motion pursuant to Rule 2–403." *Id.* R. 2–432(b)(2). If the court grants the motion to compel, the court must issue an order compelling discovery. *See id.* R. 2–433(b). If a party fails to obey an order compelling discovery, the discovering party may move for sanctions, *Id.* If either party wants a hearing on a motion for sanctions, the party must request the hearing in accordance with Rule 2–311(f). *Karl v. Blue Cross & Blue Shield of Maryland, Inc.,* 100 Md.App. 743, 745–48, 642 A.2d 903 (1994).

After receiving a motion for sanctions produced by either method outlined above, the court may enter such orders [23] "as are just, including one or more of the following."

---

**23.** The rules addressing discovery violations do not expressly indicate that an order imposing sanctions must be in writing. The Maryland

*Id.* R. 2–433(a), (b). The court may order that certain matters are established. *Id.* R. 2–433(a)(1). The court may prohibit the failing party from supporting or opposing designated claims or defenses. *Id.* R. 2–433(a)(2). The court may prohibit the failing party from introducing certain matters into evidence. *Id.* R. 2–433(a)(2). The court may strike out pleadings in whole or in part. *Id.* R. 2–433(a)(3). The court may stay further proceedings until the failing party provides discovery. *Id.* The court may dismiss the action in whole or in part. *Id.* The court may enter a judgment by default that determines liability and all relief sought by the moving party

---

Rules do not define "order." The Rules Committee's minutes do not indicate whether the Rules Committee intended for orders imposing discovery sanctions to be written or oral.

Nevertheless, the Rules' definitions of other terms suggest that orders may be written or oral. Specifically, the Maryland Rules define "writ" as "a *written* order issued by a court...." Md. Rule 1–202(aa) (emphasis added). Similarly, the Rules define "subpoena" as "a *written* order or writ...." Md. Rule 1–202(y) (emphasis added). Furthermore, the Rules define "process" as "any *written* order...." Md. Rule 1–202(u) (emphasis added). The Rules imply that some orders may be oral because they include the adjective "written" in all of these definitions.

Likewise, case law indicates that orders—not necessarily in the context of discovery sanctions—may be written or oral. *In re Ann M.,* 309 Md. at 569 n. 5, 525 A.2d 1054 (stating that "[t]he refusal to obey an order of court, *whether oral or written,* may constitute a contempt." (emphasis added)); *Goldsborough,* 12 Md.App. at 356, 278 A.2d 623 (stating that "the refusal to obey an order of the court, *whether written or oral,* or a satisfactorily proved subtle defeat of its mandate is contempt, either under the statute or at common law." (emphasis added)).

Secondary sources conflict regarding whether orders generally must be in writing. The definition of "order" provided in Black's Law Dictionary (8th ed.2004) indicates that orders must be written: "order, n. 1. A command, direction, or instruction. See mandate (1). 2. A *written* direction or command delivered by a court or judge." (emphasis added). Am.Jur.2d recognizes that "at least some court orders may be oral." Am.Jur.2d, Motions, Rules, and Orders § 43 (2008).

Based on the language of the rules, we conclude that an order imposing discovery sanctions may be oral. However, we note the contrast with the contempt rules which require that orders be in writing. Pursuant to Rule 2–433(c), a court may sanction a party for failure to obey an order compelling discovery by *oral* order under Rule 2–433(a) or by *written* order under Rule 15–206. If this interpretation is incorrect, the Rules Committee and/or the Court of Appeals should consider the matter.

against the failing party,[24] as long as the court is satisfied that it has personal jurisdiction over the party. *Id.* Lastly, if the discovering party moved to compel, the court granted the motion and issued an order compelling discovery, the other party still failed to honor the order, and the discovering party then moved for sanctions—the court may initiate a constructive civil contempt proceeding in compliance with the rules outlined above "[i]f justice cannot otherwise be achieved." *Id.* R. 2–433(b); *see supra* Part III.A.3. Ultimately, discovery sanctions are in the sound discretion of the circuit court. *Williams,* 32 Md.App. at 691, 363 A.2d 598.

5. Appellant–Specific Procedural Errors When Imposing Sanctions for Contempt and Discovery Violations

**i. Giannasca:** The court entered an order of default against Giannasca on April 30, 2007, because he failed to answer appellees' complaint within 30 days, as required by the Maryland Rules. Giannasca does not challenge this order. Nevertheless, we note that we perceive no error.

On June 5, 2008, appellees filed a petition to hold Giannasca in constructive civil contempt. On June 10, 2008, the circuit court issued a show cause order. At a hearing on June 17, 2008, the circuit court found Giannasca in contempt for noncompliance with TROs requiring an accounting, ordered him to appear on June 23, 2008, with an accountant, and prohibited him from participating in the damages hearing.

In doing so, the circuit court erred because it failed to place its finding of constructive civil contempt in writing. Additionally, the circuit court erred because it failed to state

---

24. Dismissing a case or entering default judgment usually is appropriate when the noncomplying party engaged in contumacious or dilatory conduct, or disobeyed a direct order of the court. *See, e.g., Williams v. Williams,* 32 Md.App. 685, 695, 363 A.2d 598 (1976). The decision of whether to dismiss a case or grant default judgment for failure to comply with discovery is within the sound discretion of the trial judge, however, and will not be disturbed on appeal in the absence of an abuse of discretion. *See Wilson v. John Crane, Inc.,* 385 Md. 185, 198–99, 867 A.2d 1077 (2005).

how Giannasca could purge his contempt. Rather, the circuit court merely prohibited Giannasca from participating in the damages hearing. The court also erred under clearly established case law to the extent that it converted the civil contempt proceeding to a criminal contempt proceeding. *See Bryant,* 387 Md. at 50, 874 A.2d 457; *Dorsey,* 356 Md. at 350–51, 739 A.2d 41. Moreover, on the facts of this case, we conclude that precluding Giannasca or his counsel from any participation in the damages proceeding was an abuse of discretion. *See infra* Part III.B.

**ii. Stuart:** On April 6, 2007, appellees filed a petition to hold Stuart in constructive civil contempt, alleging that Stuart violated a TRO issued by the court, which prohibited him from transferring funds out of certain bank accounts. The court issued a show cause order, requiring Stuart to appear on June 11, 2007. At the June 11 hearing, the court ordered Stuart to produce documents required by the TRO, produce documents requested during discovery, pay a fine, and appear for his deposition on June 28, 2007. Stuart did not comply with the court's June 11 order.

Appellees moved for judgment by default against Stuart on July 9, 2007, because he failed to appear for his June 28 deposition, failed to produce documents requested during discovery and required by the TRO, and generally failed to comply with the court's June 11 order. On April 28, 2008, the circuit court entered an order of default as to liability "as a sanction" against Stuart because he "purposely and intentionally failed to comply with [the][c]ourt's [June 11] order and has failed to comply with discovery."

Stuart does not challenge the order of default as to liability. Nevertheless, we note that we perceive no error. The circuit court's order can be upheld as a discovery sanction pursuant to Rules 2–432(a) and 2–433(a), because of Stuart's total failure of discovery.

On June 18, 2008, appellees moved for additional sanctions against Stuart, asking the court to exclude Stuart from participating in the damages hearing. In a memorandum attached

to appellees' original motion, they reasoned that additional sanctions were necessary because Stuart still had not produced any of the requested or required documents. In a reply memorandum, appellees reasoned that additional sanctions were necessary because Stuart failed to comply with the March 2008 TRO. On June 23, 2008, the court granted the sanctions, providing little explanation other than the following statement: "The Motion for Additional Sanctions [is] granted and [Stuart is] precluded from participating in the trial also." The court did not enter a written order.

Stuart challenges these June 23 sanctions. The memoranda filed by the parties in circuit court, in support of and in opposition to the imposition of sanctions, indicate that appellees sought sanctions for discovery failures. At the hearing, appellees and Stuart barely discussed the merits of the motion, and the court did not explain its ruling. Thus, we assume the circuit court relied on appellees and Stuart's memoranda, leading us to conclude that the circuit court granted the sanctions for total discovery failures. That appears to be justified[25] but we conclude, nevertheless, that completely precluding Stuart or his counsel from participating in the damages hearing was an abuse of discretion. *See infra* Part III.B.

**iii. Tamara:** Appellees noted Tamara's deposition for July 31, 2007, and requested that she bring certain personal records to the deposition. Tamara moved for a protective order on July 27, 2007, requesting the court to delay her deposition until the court ruled on a motion to dismiss that she filed the same day. The court scheduled a hearing on the motion to dismiss for August 27, 2007, and never acted on the motion for a protective order. Tamara failed to attend her deposition on July 31, 2007. The August 27, 2007 hearing did not occur due to the bankruptcy proceeding.

---

**25.** It is not clear whether Stuart was sanctioned twice for the same discovery failure. Nevertheless, Stuart was obligated to provide discovery, even after being sanctioned on April 28, and in any event, the issue was not raised by Stuart. Thus, we need not address whether multiple sanctions for the same failure are permissible.

Following dismissal of the bankruptcy proceeding, this case resumed on March 27, 2008, when the circuit court issued a TRO, requiring Tamara to account for and refrain from using any CCE funds. The circuit court eventually extended the TRO until June 15, 2008.

Appellees noted Tamara's deposition for May 16, 2008. Tamara refused to appear. Appellees noted Tamara's deposition for May 19, 2008. Tamara moved for a protective order on May 16, 2008. The circuit court denied Tamara's motion by order dated May 16, 2008. Tamara failed to attend her deposition on May 19, 2008, or produce any requested documents.

On May 19, 2008, appellees moved for judgment by default against Tamara as a sanction for her failure to appear for her depositions, and failure to produce the documents requested. The court scheduled a hearing on the motion for June 17, 2008.

On May 28, 2008, appellees offered to reschedule Tamara's deposition for June 4 or 5 if Tamara produced all of the requested documents by June 3. Tamara rejected this offer. Tamara finally appeared for her deposition on June 16, 2008, but she failed to produce any of her personal bank records. Moreover, during her deposition, Tamara testified that she had no knowledge of the facts in this case, including information pertaining to her own finances.

 On June 17, 2008, the circuit court granted appellees' motion and entered an order of default as to liability against Tamara as a sanction for Tamara's discovery failure. The circuit court properly granted the motion as a discovery sanction because Tamara completely failed to respond to any discovery requests until June 16, 2008, when she sat for her deposition and produced some documents. At that point, trial was scheduled for June 18, 2008. According to the scheduling order in the record, the discovery deadline expired on February 21, 2008. As to Tamara's belated attempt to cooperate in discovery on the eve of trial, we conclude that it was too little, too late. Providing documents two days before trial, and four

months after the discovery deadline, constitutes a total failure of discovery within the purpose of Rule 2–432(a). Holding otherwise would abdicate the utility and effectiveness of scheduling orders and would necessitate a postponement of the trial date or unduly prejudice the discovering party. Tamara's lack of diligence is not excused by her pending motion to dismiss and motion for a protective order. *Pac. Mortgage & Inv. Group, Ltd. v. Horn,* 100 Md.App. 311, 325, 641 A.2d 913 (1994); Md. Rule 2–432(a) (stating that "[a]ny such [discovery] failure may not be excused on the ground that the discovery sought is objectionable unless a protective order has been obtained"). Therefore, we uphold the order of default against Tamara.

After the circuit court granted the motion for default, the following colloquy occurred.

THE COURT: [Tamara]. I guess what the Court is trying to decide now with respect to the [sic] because the trial still needs to go forward on the issue of damages and that is to whether or not to permit participation. . . .

[APPELLEES' COUNSEL]: Yes, Your Honor. We very much would like to try to proceed on the issue of damages. We have sufficient documentation to support our claim and to support our allegations and support our—

THE COURT: Well, what about the idea of her participating-normally, you can participate on damages even if there is a judgment of default.

[APPELLEES' COUNSEL]: Your Honor, certainly she should be precluded from testifying about things that she has not produced any information on.

THE COURT: Oh, well yeah. Okay, yes. I mean that part is understood.

[APPELLEES' COUNSEL]: But I personally don't think that given the totality of the conduct, Your Honor, that she should be permitted to participate at all. I don't think that her conduct and we hadn't talked about failure to comply with the TRO, I don't think her conduct is any less contemptuous than [Giannasca's]. It just seems to me that this

has been a pattern of behavior from all these [appellants] and the only way effective way for Your Honor to (inaudible).

Tamara's counsel then argued against the sanction. Afterwards, the circuit court stated that,

if she wants to put on [the] defense [that she doesn't know anything] she would have had to produce all the documents and produce all the information. So, no. I mean, that may be a defense and it may be a credible defense, but I think if you're going to produce that defense, then you need to produce some information cause even though it rings true because you know, all the information needs to be produced if that was going and all the documents needed to be produced if that was going to be the claim. So, no I'm not going to permit her to participate in the damages case. I'm not going to because the whole tone and tenner [sic] of things is one of contemptuousness. It's just—I mean, in fact actually, it is similar to I won't do this, but I still want to be able to get my way. No, I'm not going to do that. So, no she can't be—so the motion will be granted in full.

The court did not enter a written order.

■■■ The basis of the preclusion is not entirely clear. It may have been part of the sanction for failure of discovery or it may have been based on a finding of contempt. If it was part of the overall sanction for failure of discovery, it was permitted by the rules, procedurally, but nevertheless, we conclude that completely precluding Tamara or her counsel from participating in the damages hearing was an abuse of discretion. *See infra* Part III.B.

**iv. TJB and MS:** On June 18, 2008, appellees filed a petition for constructive civil contempt and request for sanctions against TJB and MS because TJB and MS failed to comply with a TRO, and Tamara, TJB and MS's representative, failed to appear for her deposition. The petition sought "the entry of a finding of Constructive Civ[il] Contempt as well as a Default Judgment and the imposition of the sanction of preclusion from further participation in th[e] case . . . ." On

June 18, 2008, the court entered a show cause order, requiring a representative of TJB and MS to appear on June 23, 2008. No representative of TJB or MS appeared at the June 23, 2008 hearing. After hearing argument, the court stated:

Timing on this is horrendous on both sides. The Court has serious concerns about this. At the same time, the Court needs to have an accurate record about what is, and an opportunity to actually review that record. I think [Tamara's] obviously indifferent to the concerns of the Court. . . . But there needs to be a little bit more clarity than there is with references to what is said where about precisely what's going on. And I say that with some hesitance because I think that in addition to the timing that this was done, . . . it is an indication of a game. But at the same time, I'm concerned about going through a process that an appellate court is going to reverse. . . .

Following the court's comments, the court discussed the timing of the decision with appellees' counsel, then held a bench conference. Upon ending the bench conference and returning to the record, the court stated: "The sanctions are granted."

■■■ Based on appellees' petition and the transcript of the June 23 hearing, we conclude that the sanction of preclusion was granted as a result of a constructive civil contempt finding. Nevertheless, the court never issued a written order, and did not include a purge provision, as required by the rules. Furthermore, the court erred to the extent that it, de facto, converted the civil contempt proceeding to a criminal contempt proceeding. *See Bryant*, 387 Md. at 50, 874 A.2d 457; *Dorsey*, 356 Md. at 350–51, 739 A.2d 41. Consequently, we vacate the court's finding of constructive civil contempt against TJB and MS, and the sanctions imposed. We also vacate the sanction of prohibition against participation at the damages hearing on the additional ground that it was an abuse of discretion. *See infra* Part III.B.

At the damages hearing on June 25, the court granted summary judgment against TJB and MS because they never

answered the complaint. Even though we must vacate the judgments entered, and the rulings establishing liability occurred at the damages hearing, those rulings are not affected by the errors. Thus, we affirm the rulings as to liability.

### B. *Preclusion of Parties from Participating in the Damages Hearing* [26]

The circuit court precluded some of the appellants and their counsel from participating in the damages hearing, either as a discovery sanction or as a civil contempt sanction. We question whether totally precluding a party from participating in a hearing is a sanction permitted by either the civil contempt rules or the discovery sanction rules.

Under the civil contempt rules, the court may sanction a party after finding the party in contempt, but the court also must include a purge provision in the order imposing the sanction. Md. Rule 15–207(d)(2). As we previously explained, civil contempt proceedings must include a purge provision because "[a] civil contempt proceeding is intended to preserve and enforce the rights of private parties to a suit and to compel obedience to orders and decrees primarily made to benefit such parties. These proceedings are generally remedial in nature and are intended to coerce future compliance." *Roll and Scholl*, 267 Md. at 728, 298 A.2d 867.[27] The court's

---

**26.** The circuit court did not prohibit GCC or CCE from participating in the damages hearing. Accordingly, we refer only to Giannasca, Stuart, Tamara, TJB, and MS when referring to "appellees" in Part III.B.

**27.** In contrast, purge provisions are not required in criminal contempt proceedings. Criminal contempt proceedings are punitive—meant to serve as "punishment for past misconduct...." *Roll and Scholl*, 267 Md. at 728, 298 A.2d 867. However, this case did not involve a criminal contempt proceeding. The pleadings and hearing transcripts clearly reveal that this case involved civil contempt proceedings. By failing to provide a purge provision, a circuit court's contempt finding converts a remedial measure to a punitive measure, essentially converting the civil contempt proceeding to a criminal contempt proceeding. As we previously noted, "a civil contempt proceeding [cannot] be converted, mid-stream, to a criminal [contempt proceeding]." *Bryant*, 387 Md. at 50, 874 A.2d 457.

prohibition against any participation in the damages proceeding did not provide any mechanism by which the prohibition could be avoided.

The discovery sanction rules explicitly enumerate appropriate sanctions for discovery abuses by stating that:

Upon a motion filed under Rule 2–432(a), the court, if it finds a failure of discovery, may enter such orders in regard to the failure as are just, including one or more of the following:

(1) An order that the matters sought to be discovered, or any other designated facts shall be taken to be established for the purpose of the action in accordance with the claim of the party obtaining the order.

(2) An order refusing to allow the failing party to support or oppose designated claims or defenses, or prohibiting the party from introducing designated matters in evidence; or

(3) An order striking out pleadings or parts thereof, or staying further proceeding until the discovery is provided, or dismissing the action or any part thereof, or entering a judgment by default that includes a determination as to liability and all relief sought by the moving party against the failing party....

Md. Rule 2–433(a).

Default or dismissal are the greatest sanctions under Rule 2–433(a).[28] All of the other sanctions—taking facts as established, prohibiting a party from introducing certain evidence, striking out parts of pleadings—are measures that could lead to default or dismissal. The rules do not expressly permit completely precluding a defaulting party from participating in

---

**28.** When the Rule allows the court to enter "a judgment by default that includes a determination as to liability and all relief sought," the Rule does not imply that courts possess carte blanche power to ·enter a judgment as to damages in the amount of the ad damnum pled in the complaint, with or without a hearing on damages, or with or without all parties present at the hearing on damages. Md. Rule 2–433(a)(3) (emphasis added).

a damages hearing. Rule 2–433(a)(3) contemplates that further proceedings may be necessary to extend a determination as to liability to a judgment. *Id.* R. 2–433(a)(3) (providing that "[i]f, in order to enable the court to enter default judgment, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any matter, the court may rely on affidavits, conduct hearings or order references as appropriate, and, if requested, shall preserve to the plaintiff the right of trial by jury").

We also observe that, ordinarily, an order of default as to liability does not carry with it a judgment as to damages. *See Greer v. Inman,* 79 Md.App. 350, 556 A.2d 1140 (1989). In *Greer,* the trial court entered an order of default against the defendant, and scheduled a damages hearing. *Id.* at 352, 556 A.2d 1140. The defendant appeared pro se at the damages hearing, and attempted to participate. *Id.* at 352–53, 556 A.2d 1140. The trial court prohibited the defendant from participating, explaining that she was in default. *Id.* at 353, 556 A.2d 1140. On appeal, this Court vacated the damages, and stated:

> It is beyond cavil that the entry of [an order of] default in a claim for unliquidated damages merely establishes the non-defaulting party's right to recover. The general rule, therefore, is that, although the defaulting party may not introduce evidence to defeat his opponents' right to recover at the hearing to establish damages, he is entitled to present evidence in mitigation of damages and cross examine witnesses.

*Id.* at 357, 556 A.2d 1140 (citations and quotations omitted); *see also Miller v. Miller,* 70 Md.App. 1, 22 n. 11, 519 A.2d 1298 (1987) (upholding [an order of default] based on a party's failure to answer, and stating that "where the relief to which the party obtaining [default] judgment is entitled remains to be determined, the defaulting party has the right to participate in any hearing for that purpose and to present evidence on the issue"). The above cases did not involve discovery

violations or contempt sanctions, but illustrate the general proposition that damages must be based on something more than a bare recital in a complaint of the relief sought.

Finally, we note that sanctions must be proportionate to the misconduct. *Rodriguez v. Clarke,* 400 Md. 39, 68–70, 926 A.2d 736 (2007); *Atty. Grievance Comm'n v. James,* 385 Md. 637, 661, 870 A.2d 229 (2005); *see also Storetrax.com. Inc. v. Gurland,* 168 Md.App. 50, 88–95, 895 A.2d 355 (2006), *aff'd* 397 Md. 37, 915 A.2d 991 (2007). In *Gurland,* Storetrax failed to produce certain evidence requested during discovery. *Id.* at 90–92, 895 A.2d 355. The circuit court sanctioned Storetrax by prohibiting Storetrax from cross-examining a witness only about the evidence that Storetrax failed to produce. *Id.* at 92, 895 A.2d 355. The circuit court did not prohibit Storetrax from participating completely. *See id.* We held that the circuit court did not abuse its discretion.

In the case before us, appellants argue that the complete prohibition against participating in the damages hearing violated due process. We need not reach that question because, assuming that the civil contempt rules or discovery sanction rules allow such a sanction, which we have questioned, we conclude that, in this case, the court abused its discretion.

The complete prohibition against participation converted the damages hearing into an ex parte proceeding. A party's right to be present at a hearing or trial is a substantial right. That right is independent of the ability to present evidence. When a party and counsel are precluded from participation, counsel cannot present argument and make objections, thereby preserving the record. As a result, an appellate court must scour the record of the proceeding, looking for reversible error, a function normally not undertaken by an appellate court. Certainly, a circuit court may impose sanctions which, *inter alia,* consist of prohibiting a particular claim or defense, prohibiting the use of information called for in discovery and not disclosed, ordering that facts sought to be discovered are taken as established, dismissing

the action, and determining liability, all as appropriate to remedy a violation. Rarely, however, will a prohibition against participation in terms of making arguments and objections be justified.

The discovery and other violations in this case can be found to be wilful and egregious and justify the imposition of harsh penalties, on remand. In doing so, however, the court and parties must comply with the rules and, at the least, permit counsel to participate to preserve a record for further appellate review, if further review is sought by any party.

We are aware of *Davis v. Chatter, Inc.,* 270 S.W.3d 471, 479–80 (Mo.Ct.App.2008)—the only case, of which we are aware, that upheld a trial court's decision to completely preclude a party from a hearing. That court observed, however, that, based on its review of the record, the trial court had not committed any apparent error. *Id.* We have not reached the same conclusion in this case.

## IV. *Punitive Damages and Other Remedies in the Court's Order*

The circuit court erred when it awarded punitive damages to McCrary against CCE in the absence of an award of compensatory damages. The circuit court also erred when it failed to apportion punitive damages.[29]

### A. *Awarded Punitive Damages in the Absence of Compensatory Damages*

Maryland law clearly establishes that a party cannot recover punitive damages absent an award of compensatory damages. *See, e.g., Shabazz v. Bob Evans Farms, Inc.,* 163 Md.App. 602, 639, 881 A.2d 1212 (2005). In this case, the circuit court awarded compensatory damages against Giannasca, Stuart, Tamara, GCC, TJB, and MS in favor of CCE. The circuit court then awarded compensatory damages against

---

**29.** We use the word apportion because it is commonly used in this context. It is used to mean assessing punitive damages on an individualized basis.

CCE in favor of McCrary, MRCC, and MCC. Finally, the circuit court awarded punitive damages against Giannasca, Stuart, Tamara, GCC, TJB, and MS in favor of McCrary, CCE, MRCC, and MCC. The circuit court did not award compensatory damages against Giannasca, Stuart, Tamara, GCC, TJB, and MS in favor of McCrary, MRCC, and MCC. Thus, the circuit court erred when it awarded punitive damages against Giannasca, Stuart, Tamara, GCC, TJB, and MS in favor of McCrary, MRCC, and MCC because the circuit court did not award compensatory damages against Giannasca, Stuart, Tamara, GCC, TJB, and MS in favor of McCrary, MRCC, and MCC.

### B. *Failed to Apportion Punitive Damages*

 Appellants argue that the circuit court erred when it awarded punitive damages because it awarded punitive damages jointly and severally, thus failing to apportion the punitive damages award. We agree.

The Court of Appeals' decision in *Schloss v. Silverman*, 172 Md. 632, 192 A. 343 (1937), is our starting point. In *Schloss*, a plaintiff sued a partnership and its two partners. *Id.* at 634–35, 192 A. 343. The jury returned a verdict in favor of the plaintiff, and against the partnership and both partners. *Id.* at 635, 192 A. 343. In doing so, the jury awarded punitive damages against the three defendants in one sum. *See id.* at 642–45, 192 A. 343. The Court of Appeals reversed the judgment against both partners and the partnership. *Id.* at 645, 192 A. 343. The Court awarded a new trial to the plaintiff against only one of the partners, dismissing the other partner and the partnership outright. *Id.* The Court also vacated the punitive damages award, explaining:

The evidence showed a wide disparity in the financial worth of those defendants. It showed that the financial worth of the partnership was $ 68,038.78; the financial worth of the [sole remaining defendant was] $ 7,686.17. The jury may therefore, in awarding exemplary damages and determining the amount which would sufficiently punish the defendants, have been influenced by the net worth of the two individual

defendants and the partnership. And since it cannot be assumed that they attempted to make the "punishment fit the crime," rather than the offenders, it does not follow that they would have awarded the amount in exemplary damages against one defendant worth less than $ 8,000, that they did against three worth over $ 68,000.

*Id.* at 644, 192 A. 343. This decision was not based on an individualized determination as to tortfeasors, but was based on the fact that the total amount may have been influenced by the fact that the jury thought it was punishing two defendants, rather than one.

The Court followed *Schloss in Nance v. Gall,* 187 Md. 656, 51 A.2d 535 (1947), *modified by* 187 Md. 674 (1947). In *Nance,* the plaintiff sued a railroad company and its employee for a tort. *Id.* at 659, 51 A.2d 535. The jury awarded punitive damages in one sum against the employee and the company. *Id.* at 674, 51 A.2d 535. On appeal, the Court of Appeals reversed the judgment as to liability against the company, and upheld the judgment as to liability against the employee. *Id.* at 677, 51 A.2d 535. The Court reversed the punitive damages award against the company and the employee and remanded for further proceedings. *Id.* Relying on *Schloss,* the Court explained that

the jury could not apportion its judgment so as to make a part of it applicable to [the employee] and a part applicable to the [employer]. It could only render a joint judgment, and each would be responsible for the entire judgment. . . .

\* \* \*

We cannot free ourselves of the impression that the jury intended, by its verdict, to inflict punishment on both the [company] and [employee], and would not have rendered the verdict . . . if the action had been instituted solely against [the employee]. We do not think that a judgment rendered against two defendants should be imposed alone upon one of those defendants. Under the [J]oint Tort Feasor Act . . . he could have collected from the other defendant one-half of

the judgment to be paid. To let the judgment stand against him alone would take from him this possible recoupment. *Id.* The *Nance* Court, consistent with the fact that tortfeasors are jointly and severally liable for compensatory damages in this State, applied joint and several liability to punitive damages, but reversed on the same grounds as in *Schloss. See id.* 676–77.

Nearly thirty years later, in *Cheek v. J.B.G. Properties, Inc.,* 28 Md.App. 29, 43–44, 344 A.2d 180 (1975), we stated, in dicta, "the reasonable view [is] that a jury should be permitted to vary the damages depending upon the degree of culpability since punitive and exemplary damages are not compensation for injury; instead, they are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Id.* (citation and quotations omitted). We concluded our dicta by stating that "Maryland should ... permit[ ] apportionment of punitive damages." *Id.* at 45, 344 A.2d 180.

We retreated from that dicta in *Meleski v. Pinero International Restaurant, Inc.,* 47 Md.App. 526, 424 A.2d 784 (1981). *Meleski* involved a partnership called Fort George Associates ("FGA"). *Id.* at 528, 424 A.2d 784. The partners in FGA were John Collins, Elizabeth Meleski, Arthur Meleski, and Charles H. Steffey, Inc. *Id.* at 529, 424 A.2d 784. FGA owned a liquor license that it sold to the plaintiff. *Id.* at 529–31, 424 A.2d 784. Collins, a lawyer, consummated the sale, promising the plaintiff that he would not only sell the liquor license, but also would assist plaintiff with forming an entity to receive the license, preparing the contract for the license, and appearing before local administrative bodies. *Id.* at 530, 424 A.2d 784. Collins and Elizabeth signed the contract on behalf of FGA. *Id.* at 529, 424 A.2d 784. Unbeknownst to the plaintiff, the license actually expired approximately one month before FGA sold it to the plaintiff. *Id.* at 531, 424 A.2d 784. Consequently, the plaintiff sued the partners, the partnership, and Collins individually [30] for fraud and deceit. *Id.*

---

**30.** At that point, Collins was not a partner in FGA. *Id.* at 531, 424 A.2d 784.

The trial court "allow[ed] the jury to consider a separate award [of punitive damages] as to each defendant...." *Id.* at 547, 424 A.2d 784 (quotations omitted). Accordingly, the jury awarded the plaintiff $11,250 in punitive damages against Arthur, $11,250 in punitive damages against Elizabeth, $22,500 in punitive damages against Charles H. Steffey, Inc., and $22,500 in punitive damages against Collins. *Id.* at 532, 424 A.2d 784.

When reviewing the trial court's actions on appeal, we began by recognizing that "there is considerable logic to support the individualization of punitive damage awards in cases where multiple defendants are all liable for one sum in compensatory damages but there are shown different degrees of complicity among the individual defendants in the wrongdoing giving rise to punitive damages." *Id.* at 547, 424 A.2d 784. We then noted Cheek's "strong dicta." *Id.* at 548, 424 A.2d 784. Nevertheless, we explained that

we are now squarely faced with the issue of, not whether Maryland should permit apportionment of punitive damages, but whether it does permit it. We conclude that it does not—at least where, as in this case, the defendants are in a principal-agent relationship. The reason for our conclusion is the Maryland rule ... that liability for punitive damages, where there are multiple defendants who are in a principal-agent relationship, is joint and several without regard to their relative culpability. As this rule presently stands it does not permit the application of and cannot co-exist with a so-called apportionment rule that allows a separate award against each of several defendants measured by each defendant's individual culpability.

*Id.* at 548, 424 A.2d 784 (quotations omitted).

Relying on *Nance,* we explained that

[w]e do not now believe that *Nance* can be read so broadly as to allow us to effect a change in that rule so as to permit individualized awards of punitive damages in cases where, as here, the defendants are in a principal-agent relationship.

Only the Court of Appeals or the Legislature is free to change this long standing Maryland rule....

*Id.* at 549–550, 424 A.2d 784. Accordingly, we vacated the individualized judgments, and ordered a new trial to determine the amount of punitive damages that should have been assessed jointly and severally against the defendants. *Id.* at 551, 424 A.2d 784.

Approximately five months later, in *Embrey v. Holly*, we again reversed a judgment where the jury levied separate punitive damages awards against an employee and his employer. 48 Md.App. 571, 429 A.2d 251 (1981). In doing so, we stated that "[w]e feel obligated ... to right a wrong that stems from dicta in *Cheek[,* 28 Md.App. 29, 344 A.2d 180 (1975) ]." *Id.* at 602–03, 429 A.2d 251. We stated that "what ought to be the law, as we opined in *Cheek,* and what [the law] is are two decidedly different things." *Id.* at 603, 429 A.2d 251. We quoted from *Meleski* as follows:

[L]iability for punitive damages, where there are multiple defendants who are in a principal-agent relationship, is joint and several without regard to their relative culpability. As this rule presently stands it does not permit the application of and cannot co-exist with a so-called "apportionment" rule that allows a separate award against each of several defendants measured by each defendant's individual culpability.

*Id.* (quoting *Meleski,* 47 Md.App. at 548, 424 A.2d 784).

In *Embrey v. Holly*, 293 Md. 128, 442 A.2d 966 (1982), the Court of Appeals reversed our decision and upheld the trial court's actions, stating that "the nature of punitive damage is such that ... this award should be apportioned between multiple wrongdoers in a proper case depending upon the degree of culpability and pecuniary status of each." *Id.* at 141, 442 A.2d 966. The Court concluded by holding "that it is entirely proper to permit a jury to apportion punitive damages among multiple defendants...." *Id.* at 143, 442 A.2d 966. In a footnote, the court commented that "[a]ny indications contrary to the apportionment rule just articulated which have been perceived in the addendum to *Nance v. Gall,* 187 Md.

656, 674–77, 51 A.2d 535 (1947), are hereby disapproved. *Compare Meleski v. Pinero Restaurant,* 47 Md.App. 526, 544–51, 424 A.2d 784 (1981), *with Cheek v. J.B.G. Properties, Inc.,* 28 Md.App. 29, 43–44, 344 A.2d 180 (1975)." *Id.* at 143 n. 17, 442 A.2d 966.

We considered *Embrey* in *Exxon Corp. v. Yarema,* 69 Md.App. 124, 516 A.2d 990 (1986), *disapproved of on other grounds, Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 455–60, 601 A.2d 633 (1992). *Exxon* presented the issue of whether the Uniform Contribution Among Tortfeasors Act ("UCATA") requires a court to reduce a defendant's punitive damages award by the amount of a co-defendant's settlement. *Id.* at 134, 516 A.2d 990. We held that UCATA does not apply to punitive damages. *Id.* at 138, 516 A.2d 990. Before reaching this holding, we recognized that UCATA only applies to situations involving the common liability of multiple jointfeasors. *Id.* at 136, 516 A.2d 990. We then reasoned that UCATA must not apply to punitive damages because punitive damages are not assessed jointly and severally. *Id.* at 136–38, 516 A.2d 990. In doing so, we cited *Embrey* and *Cheek* for the proposition that,

> [b]ecause of the exemplary nature of punitive damages, defendants may not be held jointly and severally liable for such damages. Instead, punitive or exemplary damages may be awarded in different amounts against several defendants or they may be awarded against one or more of the defendants and not others, depending, not upon the damages sustained by the plaintiff, but upon the differing degree of culpability or the existence or nonexistence of malice on the part of the defendants.

*Id.* (citations omitted).

In *Owens–Illinois, Inc. v. Armstrong,* the Court of Appeals confronted an issue similar to the issue that arose in *Exxon.* 326 Md. 107, 604 A.2d 47 (1992). *Armstrong* presented the issue of whether a trial court could reduce a compensatory damages award by the amount of the plaintiff's settlement with a co-defendant, including the amount of punitive damages

in the settlement. *Id.* at 125, 604 A.2d 47. Using the same reasoning that we employed in *Exxon,* the Court held that "[b]ecause a compensatory award is a joint and several liability against all the joint tortfeasors while a punitive damage award is an individual liability, the settlement of a punitive damage claim by one tortfeasor will not reduce the compensatory or punitive damage award against the nonsettling tortfeasors." *Id.* at 127–28, 516 A.2d 990. To conclude that "a punitive damage award is an individual liability," the Court relied on *Embrey's* holding that "punitive damages could be awarded in different amounts against each defendant or that they could be awarded against one defendant and not another, depending on evidence presented as to the degree of culpability, the existence or nonexistence of malice, and the financial worth of each defendant." *Id.* at 127, 516 A.2d 990.

This line of cases indicates that the circuit court should have apportioned the punitive damages award between appellants in accordance with their degree of culpability and ability to pay such an award.

▆▆▆▆▆▆ The rationale behind punitive damages also supports this conclusion. We allow courts to award punitive damages "to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability." *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 454, 601 A.2d 633 (1992). Indeed, punitive damages "are private fines levied by civil juries to punish reprehensible conduct and to deter its future occurrence." *Cheek,* 28 Md. App. at 44, 344 A.2d 180. Accordingly, "to be fair and effective," punitive damages "must relate to the degree of culpability exhibited by a particular defendant and that party's ability to pay." *Embrey,* 293 Md. at 141–42, 442 A.2d 966. In light of these principles, it is appropriate that trial courts apportion punitive damages in accordance with the defendants' degree of culpability and ability to pay.

▆▆▆▆▆▆ Appellees argue that this case should not fall under the general rule requiring apportionment of damages because this case involves a conspiracy. Appellees reason that

apportioning punitive damages is not required in conspiracy cases because

> where two or more persons conspire to carry out a fraud ... each of them is liable to the defrauded party irrespective of the degree of his activity in the fraudulent transaction or whether he shared in the profits of the scheme. In order to establish liability of a participant in a fraud, it is not necessary to show that he was a party to its contrivance at its inception. If it is shown that he knew of the fraudulent scheme and willfully aided in its execution, he is chargeable with the consequences. All persons who participate in such a transaction are jointly liable for the ensuing injury regardless of the degree of culpability.

*Etgen v. Washington County Bldg. & Loan Ass'n*, 184 Md. 412, 418, 41 A.2d 290 (1945). We recognize that several other jurisdictions employ appellees' suggested reasoning, and allow circuit courts to award punitive damages jointly and severally in conspiracy cases. *Allred v. Demuth*, 319 Ark. 62, 890 S.W.2d 578, 581 (1994); *Jemison v. Nat'l Baptist Convention, USA, Inc.*, 720 A.2d 275, 286 (D.C.1998); *United States Sporting Prods., Inc. v. Johnny Stewart Game Calls. Inc.*, 865 S.W.2d 214, 221–22 (Tex.App.1993). Secondary sources have noted the approach used by these jurisdictions. Jerome H. Nates et al., Damages in Tort Actions § 40.06(4) (2008); Linda L. Schlueter, Punitive Damages § 4.4(b)(2)(b)(1) (5th ed.2005). Nevertheless, the Maryland cases outlined above and the rationale behind punitive damages persuade us to apply the general rule, and hold that the circuit court should have apportioned the punitive damages award, despite the fact that this case involved a conspiracy. While the degree of culpability of co-conspirators may be the same, their ability to pay is not necessarily the same. Moreover, with respect to the level of culpability, co-conspirators are similar to the parties in a vicarious liability relationship, as in *Embrey, supra.*

## C. *Remaining Remedies*

In addition to awarding compensatory and punitive damages, the circuit court's Second Revised Order and Judgment instituted four additional provisions.

### 1. Order Paragraph # 13

Paragraph # 13 of the Second Revised Order and Judgment reads "13. [Giannasca] is hereby removed as Manager of [CCE]." We must vacate the nonliability portions of the judgment because we have determined that the court erred in prohibiting all participation in the proceeding. We note, however, that we perceive no reversible error specific to this provision.

### 2. Order Paragraphs # 14 and # 15

Paragraph # 14 and paragraph # 15 of the Second Revised Order and Judgment read:

14. [Appellants Giannasca and Stuart] are permanently enjoined from taking any action of any kind on behalf of [CCE], including but not limited to initiating or filing any pleading in any legal action executing any contract or other document, or otherwise taking action of any kind which may have any effect on the assets or liabilities of [CCE].

15. A constructive trust shall be imposed in favor of [appellees] on any and all assets, including interests in any entity acquired by [Stuart, Giannasca, Tamara, MS, TJB, and GCC] directly or indirectly derived from funds or assets of [CCE], including but not limited to those two parcels of real estate located in New Orleans, Louisiana, pledged as security for the "Boxer" Mortgage as part of the Entergy Project financing, and located at 1544 Tchoupitoulas Street and 1556 Tchoupitoulas Street.

Our comments with respect to paragraph # 13 also apply to these provisions.

### 3. Order Paragraph # 16

Paragraph # 16 in the Second Amended Order and Judgment reads: "16. [Appellants Stuart, Giannasca, Tamara, MS, TJB, and GCC] shall disgorge any revenues and profits from any assets acquired with funds or assets of [CCE]."

This provision is unclear. The provision may have been intended to provide a source of payment from appellants to

appellees. It can also be read as awarding additional damages. The court's intent may be clarified on remand, as deemed appropriate.

### Conclusion

To summarize, we affirm the judgment as to liability against Giannasca, Stuart, Tamara, TJB, and MS. We vacate the non-liability portions of the judgment against Giannasca, Stuart, Tamara, TJB, and MS.

We affirm the judgment as to liability against CCE and GCC. CCE and GCC have not raised any assertions of error. Nevertheless, we shall vacate the non-liability portions of the judgment because the amount of damages will be affected by the amount of damages assessed against other parties on remand, if the amount of damages differs from that originally entered.

While we perceive no reversible error specific to provisions # 13, 14, and 15 in the Second Revised Order, we shall vacate those provisions subject to being reinstated on remand, if warranted. We shall vacate provision # 16 for the same reason and because it is unclear.

On remand, the court may conduct a proceeding to determine damages and enter a final judgment. Before doing so, the court may also determine whether sanctions should be reimposed, and if so, the nature and extent of such sanctions, not inconsistent with this opinion.

**JUDGMENT AFFIRMED AS TO LIABILITY OF ALL APPELLANTS; JUDGMENT OTHERWISE VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE–HALF BY APPELLANTS OTHER THAN CCE AND ONE–HALF BY APPELLEES OTHER THAN CCE.**